**UNITED STATES of America, Petitioner-Plaintiff-Appellee-Appellant,**

v.

**CERTAIN PROPERTY LOCATED IN the BOROUGH OF MANHATTAN, CITY, COUNTY AND STATE OF NEW YORK and 540 Pearl Street, a partnership, et al., Defendants,**

and

**Il Progresso Italo-Americano Publishing Co., Inc., Defendant-Appellant-Appellee,**

and

**Raymond E. Ryan and George H. Fankuchen, 546 Pearl Street Corp., Pearl Street Restaurant, Inc., Boylan's Tavern, Inc., Universal Brush Corp., Royal Office Supply Corp., Consolidated Loose Leaf, Inc., District Council No. 37, American Federation of State, County and Municipal Employees AFL-CIO, Samuel Lakow & Sons, Josaldo Restaurant, Inc., Bill Allen's Restaurant, Inc., Lafayette Nut Product, Inc., Civic Square Foods, Inc., Defendants-Appellants,**

and

**Portchester Realty Corp., 540 Pearl Street, a partnership, Edward R. Finch, et al., Defendants-Appellees.**

No. 312, Docket 27187.

United States Court of Appeals Second Circuit.

Argued April 10, 1962.

Decided July 5, 1962.

As Modified July 13, 1962.

Edmund B. Clark, Bethesda, Md. (Harry T. Dolan, Brooklyn, N. Y., Ramsey Clark, Asst. Atty. Gen., Roger P. Marquis, Washington, D. C., on brief), for United States of America.

Bernard L. Bermant, New York City (Carl J. Moskowitz, Skinner & Bermant, Leddy & Raber, New York City, on brief), for defendants-appellants 546 Pearl Street Corp., Pearl Street Restaurant, Inc., Boylan's Tavern, Inc., Universal Brush Corp., and Il Progresso Italo-Americano Publishing Co., Inc.

Ira I. Gluckstein, New York City, for defendants-appellants Royal Office Supply Corp. and Consolidated Loose Leaf, Inc.

Herbert Monte Levy, New York City (Arthur D. Goldstein, Samuel Goldstein & Sons, New York City, on brief), for defendant-appellant District Council No. 37, American Federation of State, County and Municipal Employees AFL-CIO.

Arthur D. Goldstein, New York City (Herbert Monte Levy, Samuel Goldstein & Sons, New York City, on brief), for defendant-appellant Samuel Lakow & Sons.

Herman G. Blumenthal, New York City (Herman G. Blumenthal and Abraham Schatzman, New York City, on brief), for defendant-appellant Josaldo Restaurant, Inc.

Philip A. Paulson, New York City, on brief, for defendant-appellant Bill Allen's Restaurant, Inc.

Nathan L. Goldstein, New York City (Nathan L. and Joseph Z. Goldstein, New York City, on brief), for defendant-appellant Lafayette Nut Product, Inc.

Arnold Fieldman (of Fieldman & Breslaver), Brooklyn (Samuel K. Beier, New York City, on brief), for defendant-appellant Civic Square Foods, Inc.

John H. Finn, Sincerbeaux & Shrewsbury, New York City, on brief for defendants-appellants, Raymond E. Ryan and George H. Fankuchen.

Matthew J. Tackella, New York City (Loretta A. Conway, Lamb & Lamb, New York City, on brief), for defendants-appellees Portchester Realty Corp. and 540 Pearl Street, a partnership.

George R. Hinckley, New York City (Finch & Schaefler, New York City, on brief), for defendants-appellees Edward R. Finch, et al.

Before LUMBARD, Chief Judge, and FRIENDLY and KAUFMAN, Circuit Judges.

FRIENDLY, Circuit Judge.

Wishing to build a Customs Court and Federal Office Building in Foley Square, the United States began an action in the Southern District of New York to condemn an area bounded generally by Worth Street, Lafayette Street, Duane Street, and a line about 175 feet east of and parallel with Broadway. A declaration of taking, dividing the property into 20 damage parcels, was filed on February 1, 1960; along with it, the Government deposited in court $2,613,501, estimated as just compensation. On May 9, 1960, Judge Knox granted the Government's motion for an order of possession, decreeing that the United States would be entitled to take over the property "on May 1, 1961 or on such earlier dates as any part of said property shall be vacated by the existing tenants or former owner-occupants."

Judge Knox's order did not establish the terms upon which those in possession could retain it until the May 1, 1961 deadline; to fix these the Government entered into leases with most, although not all, of the occupants. The leases were on a basic mimeographed form, for a term stated as beginning February 1, 1960 and ending April 30, 1961; quite clearly they were not signed until after Judge Knox's order of May 9.[1] Two provisions require mention because they were later to be relied on by the Government as working a waiver of the claims for fixtures asserted by many of the appellants.[2] Paragraph 16, set out in the margin,[3] was a complete release of the United States from all claims arising from the condemnation. The Government deleted this for anyone who sought its excision; all but three of the present appellants did.[4] However, the Government would not consent to the removal of paragraph 11,[5] and it argued, successfully in the District Court, that this alone sufficed to destroy any claim for fixtures its tenant would otherwise have had.

Prior to trial the owners of parcels 1, 4, and 5 settled with the Government; the claim for parcel 20, consisting of the land comprising the beds of Pearl and Elk Streets, was not adjudicated with the others. Trial, by Senior Judge Knox without a jury, took about 30 court days, spread over three months, in late 1960; in addition, myriad motions were heard before and after the trial. The contesting fee owners were awarded $2,265,875; the claims of twenty-seven tenants for

1. Although not all the relevant leases have been handed up to us as exhibits, five of the six that were bear dates ranging from June 2 to August 30, 1960; the sixth is not dated. At a hearing on June 3, 1960, counsel for the Government told Judge Knox that the leases "are in the negotiating stage."

2. Of the fixture-claimant appellants, only Il Progresso Italo-Americano Publishing Co., Inc., Royal Office Supply Corp., and Consolidated Loose Leaf, Inc. did not sign leases with the Government.

3. "16. As partial consideration for this lease, the Lessee hereby releases the Lessor from any and all claims, damages and causes of action arising from the acquisition of the property of which the demised premises is a part, and the vesting of title thereto in the Lessor by the Condemnation Proceedings in the United States District Court * * *."

4. The three were Boylan's Tavern, Inc., Josaldo Restaurant, Inc., and Pearl Street Restaurant, Inc.

5. "11. The Lessee will make no alterations in, or additions to, said premises without first obtaining the Lessor's written consent and that all the erections, additions, fixtures and improvements, whether temporary or permanent in character (except only the movable furniture, machinery and equipment of the Lessee), made in or upon the premises shall become the Lessor's property and shall remain upon said premises at the termination of said term by lapse of time or otherwise, without compensation to the Lessee. It is further understood and agreed that this lease and the rental herein provided excludes fixtures, equipment and removable articles of personal property which are the property of the tenants and removable at the expiration of this lease by the tenant in accordance with the terms hereof." The last sentence was added in typewriting.

444

fixture awards were denied. The appellants here are three fee owners and eleven tenants; nine other tenants' appeals were dismissed by this Court as untimely; the remaining seven did not appeal. Our disagreement with certain portions of the decision, in considerable part because of our now taking a view of New York law different from that expressed in an earlier opinion, is not to be deemed as detracting from our high regard for the public service rendered by Judge Knox in discharging this onerous task.

### 1. *The Respective Roles of Federal and State Law*

Many of the controversies before us hinge on what the Government "took." The Government contends that "Determination of what is taken in federal condemnation proceedings and the ascertainment of compensation therefor are governed by principles of federal law," and that New York property law concepts are therefore irrelevant. It relies on such unquestionable propositions as that the United States' power of condemnation "can neither be enlarged nor diminished by a State. Nor can any State prescribe the manner in which it must be exercised," Kohl v. United States, 91 U.S. 367, 374, 23 L.Ed. 449 (1876), and that " * * where essential interests of the Federal Government are concerned, federal law rules unless Congress chooses to make state laws applicable," United States v. 93.970 Acres of Land, 360 U.S. 328, 332–333, 79 S.Ct. 1193, 1196, 3 L.Ed.2d 1275 (1959). Acceptance of all this and of the corollary that Federal law governs the principles whereby "just compensation" is determined in a Federal condemnation still does not establish the conclusion the Government draws from them.

The declaration of taking relies on various statutes, of which the Act of August 1, 1888, 25 Stat. 357, as amended, 40 U.S.C.A. § 257, is sufficient and typical. That section provides that whenever an officer of the Government is authorized "to procure real estate for the erection of a public building or for other public uses. he may acquire the same for the United States by condemnation

* * *." By the declaration the United States took "The land, including all buildings and improvements thereon, all appurtenances thereto, and all interests therein * * *" Although the Government took only "real estate," it "took" whatever was real estate.

■ We see no basis for doubting that Congress meant that a Federal court, in determining what such a taking embraced, should look to the law of the state where the property is located. Although the Government urges us to look to "Federal law" to determine what the taking included, it does not tell us where to find this—no corpus of Federal law on this subject exists and 1962 seems rather late to start developing one, especially for so limited a function. Even the celebrated opinion, now rejected, upholding the power of Federal courts to disregard state decisional law in certain areas, recognized that state law should be looked to as regards "rights and titles to things having a permanent locality, such as the rights and titles to real estate, and other matters immovable and intra-territorial in their nature," Swift v. Tyson, 16 Pet. 1, 18, 41 U.S. 1, 18, 10 L.Ed. 865 (1842). Although the principle announced in Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), would not deprive Congress of constitutional power to create a separate "Federal law" as to what constitutes real property for Federal condemnation, see Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943), the practical considerations for referring to state law for that purpose are overwhelming. All states have bodies of law as to what is real and what is personal property, which they require for a variety of transactions. Persons dealing in land within a state must conduct themselves in the light of state law, which will inevitably govern most of their relations; it would be inconvenient in the last degree if they had also to take cognizance of a Federal property law that would apply only in the rather rare event of a Federal condemnation. Hence we hold that Congress meant us to refer to New

York law to determine what the United States acquired when it "took" what it did here, United States v. Becktold Co., 129 F.2d 473 (8 Cir., 1942); United States v. 19.86 Acres of Land, 141 F.2d 344, 151 A.L.R. 1423 (7 Cir., 1944); Carmichall v. United States, 273 F.2d 392 (5 Cir., 1960).

None of this gainsays that, subject to the overriding requirements of the Fifth Amendment, including the mandate "nor shall private property be taken for public use, without just compensation," Congress could constitutionally create a special Federal law of real property for Federal condemnation purposes, or that such a body of law could define real property more narrowly than the law of the situs. It is even possible that under existing statutes the United States might elect not to "take" certain interests which the situs state regards as real property, cf. United States v. Certain Interests in Property, 271 F.2d 379, 382-384 (7 Cir., 1959), cert. denied, 362 U.S. 974, 80 S.Ct. 1058, 4 L.Ed.2d 1010 (1960), a point we do not decide.[6] But nothing in the declaration here suggests an intention that the United States was taking less than all the real property, and nothing in the authorizing statutes suggests any source for defining that save New York law.

### 2. Il Progresso

It will be convenient to take up first the award of $254,050 ($70,000 for land and physical structures and $184,050 for fixtures) for property owned by Il Progresso Italo-Americano Publishing Co., Inc. in fee simple, from which both the Government and Il Progresso appeal. These appeals present two basic questions, one relating to the New York law concerning fixtures, and the other to principles of valuation, without being complicated by considerations as to the respective rights of landlord and tenant or as to the effect of the Government leases that arise on other appeals.

The building is an old one, erected in 1878. It was then and ever since has been used as a printing plant, having been altered from time to time to meet the needs of the business, notably in 1940 when a concrete pit was installed, the cellar floor was lowered and a mezzanine was removed to permit the installation of a press 33' 10" long, 9' wide and 16' high. The building contained a quantity of special equipment useful in newspaper publication, such as a sidewalk elevator to carry heavy rolls of newsprint, monorails to move the paper to the press, an electrically driven dumbwaiter to carry papers from the press to the mailing and delivery room, special duct work and electrical systems, and the like.

Wittman, a real estate expert called by Il Progresso, valued the land at $55,750, and the buildings, exclusive of fixtures and machinery, at $44,250, for a total of $100,000; this appraisal assumed a gross rental of $12,000 per annum which a vacancy allowance and expenses [7] would reduce to a net of $7,652. To this $100,000 figure he added $484,084, found by Il Progresso's machinery expert, Yocum, to be the depreciated replacement cost of the machinery and fixtures. The Government's real estate expert, Kazdin, estimated the gross rental income for the land and building ex machinery and fixtures at $13,800; however, a larger allowance for expenses, which included many items omitted by Wittman, reduced the net income to $4,100. Capitalizing this at 9% for 10 years, for a product of $25,680, and adding the present value of the reversion of the land at the end of the 10 years ($67,000 discounted at 6%, or $37,413), he arrived at a total of $63,093. He concluded that the land alone was worth more than the land with the building and

---

6. Both these hypothetical cases would pose the issue of the Government's liability to compensate for damage to the untaken "real" property, United States v. Grizzard, 219 U.S. 180, 31 S.Ct. 162, 55 L.Ed. 165 (1911), an issue that might arise also when a taking of "real" property caused serious damage to property deemed "personal" by state law.

7. These included only taxes, insurance, repairs and a replacement reserve.

that the parcel should be appraised at its land value, $67,000, alone. Although the Government contested any allowance for fixtures and machinery, it offered evidence of an expert, Shulman, that "based upon present day sound market value for similar and comparable used equipment, delivered, installed and connected, in good operating condition," this was $178,050. Shulman's appraisal did not include items such as power wiring, shelving, floor coverings, cabinets, window fans, and others.

Judge Knox accepted Kazdin's appraisal of $67,000 for the land, which he increased to $70,000. He made no allowance for the building, believing that "to the ordinary purchaser, the building is an encumbrance that must be demolished" and that "as a newspaper plant, the building is antiquated and obsolete, and this limits its marketability." To the $70,000, he added Shulman's $178,050 figure, plus $6,000 for a newspaper folding and marking machine that Shulman had omitted, for a total of $254,050. The Government appeals on the ground that the machinery for which the judge made an allowance was not "taken"; Il Progresso complains about the alleged inadequacy of the allowance for the machinery, the failure to make any allowance for other fixtures, and the insufficiency of the award for the land and building.

■■ Taking first the Government's appeal and looking to the law of New York to determine what constitutes "real" property, as we must, we think it plain that the Government "took" the bulk of the items for which Judge Knox made an allowance, although his opinion does not indicate any detailed consideration of the New York authorities. New York entertains a rather broad view of what improvements are regarded as realty. In Jackson v. State, 213 N.Y. 34, 106 N.E. 758, L.R.A.1915D, 492 (1914), the Court of Appeals held that a taking of real estate included "machinery, shafting, elevators and conveyors." Machinery is deemed real property "where it is in-

stalled in such manner that its removal will result in material injury to it or the realty, or where the building in which it is placed was specially designed to house it, or where there is other evidence that its installation was of a permanent nature." Matter of City of New York (Whitlock Avenue), 278 N.Y. 276, 281–282, 16 N.E.2d 281, 282 (1938). The New York courts also regard as real estate those improvements which "were used for business purposes and would lose substantially all of * * * [their] value after severance," although their removal does not damage the rest of the realty. Matter of City of New York (Seward Park Slum Clearance Project), 10 A.D.2d 498, 500, 200 N.Y.S.2d 802, 804 (1st Dept. 1960). Such improvements would include "custom built or specially designed fixtures [which] have little or no 'market value' when ripped out and removed," Marraro v. State, 15 A.D.2d 707, 223 N.Y.S.2d 556 (3d Dept. 1962). Il Progresso's large and heavy press and special printing machinery fit these descriptions.

■ These same considerations show at least partial merit in Il Progresso's complaint that the judge failed to fix compensation for a number of fixtures, which it values at $27,445, including a sheet metal penthouse, shelving, partitioning, paneling, industrial and power wiring, duct work, gas and water piping, dumbwaiter, monorails, and an exhaust system. The judge's only comment about these was that the Government's appraiser "made no effort to evaluate shelving, floor coverings, cabinets, window fans and the like, which over the years had been installed by Il Progresso." Most, perhaps all, of the items listed seem to meet the New York test as to what constitutes real property. We must therefore reverse for a valuation of those falling within that category, save any which Il Progresso has removed; the latter should be treated as stated hereafter with respect to tenants' fixtures. The judge will also be free to reconsider on remand whether any of the items included in Shulman's appraisal do not qualify

as real property under the applicable New York standards.

Il Progresso's principal attack, that the District Court failed to value the entire property for its "highest and best use," to wit, a newspaper plant, requires some analysis, since that rather hackneyed phrase contains two different thoughts, one unquestionably valid and the other only dubiously so.

■ It is surely true that the owner of property being condemned is not limited to its value for the particular use to which he has chosen to put it, if he can prove it would bring more if sold to be used for another purpose. For example, the value of residential property in an area becoming devoted to business is not limited to what it would bring as a dwelling, United States ex rel. T. V. A. v. Powelson, 319 U.S. 266, 275, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943). Hence, irrespective of Il Progresso's existing use of the building, if it had shown that there was a market for an old building in downtown New York specially adapted for printing, and that prospective purchasers would pay more for the building on that basis than on any other, it would be entitled to the value so established. However, Il Progresso produced no evidence that anyone other than itself was interested in the building as a printing plant. Its contention, therefore, is really a quite different application of the "highest and best use" idea, namely, that an owner is entitled to the value of the property to itself, even though no one else would have paid so much for it.

■■ We restate the contention in order that it may be accurately analyzed—not because we believe that even as so restated it ought to be swiftly brushed aside. Since "just compensation" means "the full and perfect equivalent in money of the property taken" and "the owner is to be put in as good position pecuniarily as he would have occupied if his property had not been taken," United States v. Miller, 317 U.S. 369, 373, 63 S.Ct. 276, 279, 87 L.Ed. 336 (1943), "market value" is not necessarily the equivalent of just compensa-

tion but rather a useful and generally sufficient tool for arriving at this. Although there is no reason in principle for refusing to take account of special value to the owner, as, of course, there is with respect to special value to the taker, Boston Chamber of Commerce v. City of Boston, 217 U.S. 189, 195, 30 S.Ct. 459, 460, 54 L.Ed. 725 (1910), "there are serious practical difficulties in ascertaining, even roughly, what a given property may have been worth to a particular individual at any given time," and also in separating such value from "consequential injuries" or "incidental losses" which are generally held to be noncompensable, 1 Orgel, Valuation under Eminent Domain (2 ed. 1953) § 14; In re Post Office Site in Borough of the Bronx, 210 F. 832, 835 (2 Cir. 1914). Confronted with the occasional inadequacy of the "market value" test and the general impracticability of any other, the courts have adopted a pragmatic solution. In certain instances, notably in the case of property held for eleemosynary or other nonprofit purposes, such as schools, churches and clubs (but not private dwellings), and public utilities, where property with a high value for the use to which it is being put would have a much lower market value because of the paucity or absence of buyers for that use, the courts consider value to the owner, sometimes finding it necessary to apologize for what is wrongly conceived to be a lapse from true doctrine by the rather obviously untrue statement that the property has "no" market value, 1 Orgel, supra, § 38; in such cases evidence of reproduction cost less depreciation is admitted, whether as showing value to the owner or as indicating what might be paid by a buyer if one existed.

■ However, for the reasons indicated, these instances where special value to the owner is considered have been quite narrowly confined. "Where the property is of a kind that is frequently bought and sold, the courts appear to have little hesitancy in accepting the market value standard even though * * there is a clear discrepancy between mar-

ket value and value to the owner." 1 Orgel, supra, § 38, at p. 177. Land "improved" with an old building is "frequently bought and sold," and the use of a building for printing purposes would not normally be so extraordinary as to warrant invoking the exceptional doctrine applicable to utilities and non-profit buildings. As Il Progresso's expert himself testified, "Printing is not that special that the whole building becomes a specialty." What gives some pause is that here refusal to bring this case within the exception has resulted in the owner's receiving no award whatever for the structure—it is argued that this is the very kind of case where failure to take account of value to the owner is most unfair. Yet it is hard to see how the case differs from that of an old house containing structural features especially designed for the owner's comfort, for which no allowance would be made if the structure did not add to the value of the land. We are therefore not inclined to expand the categories to which the exception has been limited so as to include Il Progresso's building, a decision which we reach the more readily here since Il Progresso tendered no sufficient evidence as to what the special value of the structure to it was. Hence, in the absence of evidence that the building possessed a higher market value as a printing plant than as a loft building, and with the testimony of the Government's expert that as a loft building it had no market value, the judge was justified in concluding that no award should be made for the structure itself.

■ This conclusion, however, does not compel a decision that valuation of the machinery and other fixtures, held above to have been taken by the Government, must be limited to their market value after removal and before installation elsewhere, a figure reflecting a large discount for the heavy removal and installation costs a buyer would have to incur, United States v. Becktold Co., 129 F.2d at 481. In contrast to the antiquated shell of the building whose only claim to value arose from alterations adapting it for printing use, the machinery and related installations possessed a substantial resale value, or at least would have possessed this if the costs of removal and reinstallation entailed by the condemnation did not destroy it. Yet it is this very factor of large loss of value through removal that constitutes a principal reason why New York regards such machinery as "real estate." Just as the value of land and buildings is normally measured by what a purchaser would pay but for the condemnation, so the appropriate measure of the value of machinery and fixtures is what a purchaser would pay for them for use in the premises being condemned.

■ Since sales of such machinery and fixtures *in situ* are rare, the case was thus one where, as in United States v. Becktold Co., supra, it was appropriate for the claimant to introduce evidence of the depreciated reproduction cost of the machinery as some indication of what a hypothetical purchaser would pay. Although such evidence is receivable as a guide to the determination of just compensation in such a case, the trier of the facts is not bound by it. Judge Knox expressed abundant reason for skepticism as to Yocum's valuation. Thus, Yocum estimated the press to have a replacement cost new of $332,000 and a depreciated replacement cost of $232,400. Yet Il Progresso had bought it in 1940, from the New York Sun, when it was already 13 years old, for $7,500. Granting that the latter figure did not include heavy installation costs, it was enough to cast doubt on the validity of the former. The judge was struck also by the appraisal of $90,545, reflecting a depreciation factor of only 30%, of Intertype gas heating machines, some of which were approximately 40 years old.

■ Il Progresso argues that even if the judge was not bound to accept Yocum's figure, he should not have accepted Shulman's since these were based on an erroneous theory. We do not see why. Shulman's figures purported to reflect "present day sound market value for similar and comparable used equipment,

delivered, installed and connected, in good operating condition." Both Shulman and Yocum were endeavoring to arrive at a figure representing the cost of providing Il Progresso's equipment and machinery and in that way to arrive at its "value." Yocum did this by obtaining costs new and deducting estimated percentages of depreciation; Shulman did it by taking second-hand prices as installed—whether he did this accurately or not was for the judge to say. We see no reason why the court was required to find the value of the machinery *in situ* to be higher than the cost of buying and installing similar machinery there or elsewhere.

We thus affirm the award to Il Progresso except for directing the district judge to add to or subtract from the items included in the taking as may be appropriate in the light of our discussion.

### 3. *Other Fee Owners*

▇▇▇ The two other fee owners, 546 Pearl Street Corp., and Ryan & Fankuchen (a partnership which owned the premises at 548 Pearl Street) argue only that the awards for land and building, $42,500 in the case of 546 Pearl Street Corp. and $30,000 to Ryan and Fankuchen, were inadequate. The former's claim that the judge failed to take account of the land's alleged "highest and best use," in this case, as a restaurant, has been answered by what we have said above.[8] The latter challenges the judge's acceptance of Kazdin's appraisal of $29,-

000 based on a capitalization of estimated net rental income, and his rejection of its expert's opinion figure of $47,500. We see no basis for disturbing Judge Knox's findings, United States v. Glanat Realty Corp., 276 F.2d 264 (2 Cir. 1960).

### 4. *The Tenants' Fixture Claims*

a) *Analysis of the claims and of their disposition below.*

Eleven former tenants appeal from Judge Knox's denial of their claims for fixtures. The claims of the three tenants who had signed leases with the Government containing paragraph 16, see footnotes 3 and 4, were denied on the basis that the paragraph "extinguished" and "effectively bars" the claims. Paragraph 11 was deemed equally fatal, the judge saying "Thus, subsequent to the condemnation, the Government specifically disclaimed title to the 'fixtures, equipment and removable property'; and the tenants acquiesced in such disclaimer." Another ground for denial was a standard alterations clause contained in the lease of each tenant with his former landlord (overridden by typewritten provisions in two cases). This clause appeared in two forms, different only in that one explicitly reserved "movable trade fixtures" to the tenant.[9] The judge took the view, erroneous under New York law, that only "installations whose removal could not be made without causing substantial injury to the realty, or were so affixed thereto as to become a part

---

8. Fixtures at 546 Pearl Street, claimed by the fee owner's tenant and sister corporation, Pearl Street Restaurant, Inc., will be considered with the other tenant fixture claims.

9. Version I: "All alterations, additions or improvements upon demised premises made by either party, including all paneling, decorations, partitions, railings, mezzanine floors, galleries and the like shall, unless the Landlord elect otherwise \* \* \* become the property of Landlord, and shall remain upon, and be surrendered with said premises as part thereof at the end of the term \* \* \*."

Version II: "All alterations, decorations, additions or improvements (including panelling, partitions, railings mez-

zanine floors, galleries and the like), except movable trade fixtures made by either party, shall become the property of Landlord upon installation, unless Landlord shall elect otherwise \* \* \*."

Version I of the clause appeared in the leases of Royal Office Supply Corp., District Council No. 37, and Universal Brush Corp. Version II appeared in the leases of Bill Allen's Restaurant, Inc., Civic Square Foods, Inc., Lafayette Nut Product, Inc., Boylan's Tavern, Inc., Josaldo Restaurant, Inc., and Consolidated Loose Leaf, Inc. It was overridden by typewritten provisions in the leases of Civic Square and Josaldo. Samuel Lakow & Sons had no lease; whether Pearl Street Restaurant, Inc. had a lease does not appear.

thereof" could possibly be compensable, and regarded the alterations clause in either form as conclusive that "title to * * * [such] alterations, additions, and the like, at the time of their installation, vested in the landlord, and, in the course of the condemnation proceedings, such installations, presumably, vested in the Government." Since at least one of these three grounds applied to each claim, all were dismissed.

We have concluded that none of the grounds is valid. It will be convenient to deal first with the issue whether the tenants owned real property which the Government took, next to consider the effect of the two types of leases signed with the Government, and finally to outline the procedure on remand and discuss certain special problems.

b) *The nature of the tenants' interests under New York law.*

Discussion had best begin with what interest New York would recognize in a lessee in the absence of contrary agreement with his lessor. The tenants rely strongly on the statement of the New York Court of Appeals that "A tenant is entitled to compensation in condemnation proceedings for such fixtures as would have become part of the realty if they had been installed permanently by the owner of the fee." Matter of City of New York (Whitlock Ave.), 278 N.Y. 276, 281, 16 N.E.2d 281, 282 (1938); see also Matter of City of New York (Allen St.), 256 N.Y. 236, 176 N.E. 377 (1931). In fact, the New York rule is not that broad. Some fixtures, even though annexed by the tenant, are "distinctively realty" and therefore become the property of the landlord; others which are removable without material injury to the freehold remain the property of the tenant even though they are classified as realty because they are severely damaged or lose substantially all their value on severance, Matter of Water Front on North River in City of New York, (Conron v. Glass), 192 N.Y. 295, 84 N.E. 1105, 18 L.R.A.,N.S., 423 (1908); Matter of City of New York (In re Acquiring Certain Property on North River Water

Front), 118 App.Div. 865, 103 N.Y.S. 908 (1st Dept.) aff'd mem., 189 N.Y. 508, 81 N.E. 1162 (1907); Century Holding Co. v. Pathe Exchange, Inc., 200 App.Div. 62, 192 N.Y.S. 380 (1st Dept. 1922); Matter of City of New York (Rockaway Blvd.), 201 App.Div. 862, 193 N.Y.S. 951 (2d Dept. 1922); Matter of City of New York (Seward Park Slum Clearance Project), 10 A.D.2d 498, 200 N.Y.S.2d 802 (1st Dept. 1960); Marraro v. State, 15 A.D.2d 707, 223 N.Y.S.2d 556 (3d Dept. 1962); Morganthal v. State, 15 A.D.2d 712, 223 N.Y.S.2d 558 (3d Dept. 1962); Matter of City of New York (In re Block Bounded by Avenue A and First Ave., etc.), 66 Misc. 488, 511–515, 122 N.Y.S. 321, 338–341 (Sup.Ct.1910). See also In re Post Office Site in Borough of the Bronx, 210 F. 832 (2 Cir. 1914). Examples give meaning to the distinction. Asphalt cemented to the floor by the tenant belongs to the owner. But "sectional movable and interchangeable partitions," specially adapted to the building but removable without injury to it, are "realty" belonging to the tenant, Century Holding Co. v. Pathe Exchange, Inc., supra. Machinery which is sufficiently annexed to be a fixture within the Whitlock Avenue case is ordinarily "realty" which belongs to the tenant, Matter of City of New York (In re Acquiring Certain Property on North River Water Front), supra; Matter of City of New York (In re Block Bounded by Avenue A and First Ave., etc.), supra. Similarly, wiring and pipes are the kind of "realty" which remains the property of the tenant "where these items have no connection with the operation of the building and serve no purpose but the proper functioning of the tenant's fixtures, and are a part of the fixtures instead of the building," Marraro v. State, supra; accord, Morganthal v. State, supra.

This distinction between improvements made by the tenant which become the landlord's property and those which remain the tenant's even though considered "realty" is not substantially changed by the standard alteration provision, see fn. 9. This clause, with or without the ex-

ception for movable trade fixtures, adopts and perhaps very slightly extends the New York concept of fixtures which, though annexed by the tenant, are "distinctively realty." The specific inclusions, "panelling, partitions, railings, mezzanine floors, galleries and the like," although not exclusive, give a good lead as to what is meant. Such was this Court's conclusion in In re Howard Laundry Co., 203 F. 445, 447 (2 Cir. 1913), where, in holding that heavy machinery which could not be removed without injury to the building or itself belonged to the bankrupt tenant, the Court said that a clause "providing that all additions and improvements which may be made by either party shall be the property of the landlord * * * was simply declaratory of the law and gave the landlord no additional right to articles found to be trade fixtures." See Century Holding Co. v. Pathe Exchange, Inc., supra; Matter of City of New York (Seward Park Slum Clearance Project), supra.

The Government's chief argument against this is a sentence in United States v. 21,815 Square Feet of Land, 155 F.2d 898, 900 (2 Cir. 1946), saying that "the unremoved fixtures belonged to the lessor by virtue of the alteration clauses." These included wiring, electric installations, composition flooring, ventilating panels, partitions, fireproof doors and frames, and furnace room equipment, at least some of which would remain the tenant's real property under the views announced by the New York courts and followed by this Court in the Howard Laundry case. With great regret, we must confess that the sentence, concerning a single point in a complicated case, with quite inadequate briefs which failed to refer either to Howard Laundry or to many pertinent New York precedents, was not a correct statement of New York law when made and clearly is not so in the light of later New York decisions we are obliged to follow. The Government likewise cannot prevail on its contention that even if the tenants had property that was "taken," they were required to work out their compensation

claims through the landlords because of a so-called "unit rule." As said by Judge Learned Hand, "it is an undue simplification to extract from the books any 'Unit Rule' whatever, in the sense of general authoritative directions." United States v. City of New York, 165 F.2d 526, 528, 1 A.L.R.2d 870 (2 Cir. 1948). Finally, the Government claims that here the value of the tenants' fixtures has already been considered in the awards for the fees. In most cases, even perhaps in all, this is not so; but in any event the tenants are entitled to be compensated for what the Government took from them.

■ Since the judge denied compensation for many items which New York considers realty belonging to a tenant when a lease is ended, there must be a remand to determine which items are fixtures that are "distinctively realty" or otherwise within the alteration clause and thus the landlord's, which are fixtures that are realty owned by the tenant, and which are personal property for all purposes,—unless, as the Government urges, the leases with it rule out otherwise valid claims.

c) *The Government leases.*

We deal first with the majority of the tenants, who insisted on the deletion of paragraph 16 releasing "all claims, damages and causes of action arising from the acquisition of the property of which the demised premises is a part," but are now confronted with the argument, sustained by the District Court, that the typewritten addition to paragraph 11, see footnote 5, still totally deprived them of the only claims they ever had, to wit, for fixtures so affixed to the building as to be real estate under New York law but not so affixed as to become the landlord's property.

■ The Government argues that the added sentence operated as a disclaimer of taking of any property that was removable, even though its value would be lost in the process. The tenants respond, with greater persuasiveness, that what the Government took was determined on February 1, 1960; that the short term

leases, made several months thereafter, did not operate as a reconveyance by the Government of property it had taken; and that the sentence, particularly when read in relation to what precedes it, means nothing more than that the tenants may at the end of the term remove those things which belong to them. This construction, reasonable in itself, is rather confirmed by a letter written by the Government on June 29, 1960, saying that "The restrictions imposed by Paragraph 11 are intended to apply only to alterations where additions were made to the premises subsequent to the date when the Government took possession namely February 1, 1960," and by the obvious purpose of the tenants in deleting paragraph 16, see Hughes v. Samedan Oil Corp., 166 F.2d 871 (10 Cir. 1948). We, therefore, hold that the Government leases are no bar to those claimants who procured the elimination of paragraph 16.

 We reach the same result as to the three claimants who did not obtain the excision. The regional chief of the acquisition and disposal division of the General Services Administration admitted that after the order had been signed, he sent certain occupants (Il Progresso, Boylan's Tavern and Universal Brush Corporation) the form lease including paragraph 16, which had been drawn in part and reviewed in full by the Administration's regional counsel, and had "said if we could not reach agreement and get rental payments we would ask for eviction." An officer of Universal Brush Corporation testified a Government representative had told him he could not stay unless he signed the lease. The Government does not deny that any threat of eviction was baseless in the light of Judge Knox's order of May 9, 1960, but says the tenants should have disregarded it, see Andrus v. St. Louis Smelting & Refining Co., 130 U.S. 643, 647, 98 S.Ct. 645, 32 L.Ed. 1054 (1889); American Law Institute Restatement of Torts, § 540, since the court records were open to their inspection—and this despite the Government's having dealt directly with tenants known to be represented by counsel. However, it is settled law that even a plaintiff in deceit, let alone a party seeking rescission, can prevail on the basis of misrepresentations he could have detected by checking an official record, including misrepresentations concerning the existence of a judicial decision. Sainsbury v. Pennsylvania Greyhound Lines, Inc., 183 F.2d 548, 551, 21 A.L.R. 2d 266 (4 Cir. 1950); Seeger v. Odell, 18 Cal.2d 409, 415, 115 P.2d 977, 980, 136 A.L.R. 1291 (1941); Loverin v. Kuhne, 94 Conn. 219, 108 A. 554, 33 A.L.R. 848 (1919); Lynch v. Palmer, 237 Mass. 150, 129 N.E. 374, 33 A.L.R. 842 (1921); Suraci v. Ball, 160 Pa.Super. 349, 51 A.2d 404 (1947); Crawford v. Armacost, 85 Wash. 622, 149 P. 31 (1915); Woteshek v. Neumann, 151 Wis. 365, 138 N.W. 1000 (1912). Compare Bishop v. E. A. Strout Realty Agency, Inc., 182 F.2d 503, 505 (4 Cir. 1950). See American Law Institute Restatement of Torts, § 540, comment *b*, § 545, comment *b*; 5 Williston, Contracts (rev. ed. 1937) § 1516, at p. 4232, § 1495. If we were to sustain this argument of the Government, it would have to be rather on the basis that of the three claimants, Pearl St. Restaurant, Josaldo Restaurant, and Boylan's Tavern, who signed leases including paragraph 16, there was no specific evidence that the Government told the two former that they must sign the leases in order to retain possession.

 However, we do not find it necessary to rely on the considerations set forth in the preceding paragraph. We refuse to enforce the release because, with everything indicating that it was not arrived at by arms' length negotiation, it offends the command of the Fifth Amendment, "nor shall private property be taken for public use, without just compensation,"—a command that the Constitution addresses to the executive fully as much as to the Congress and the courts. Just as the Government's interest "in a criminal prosecution is not that it shall win a case, but that justice shall be done," Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), so its interest as

a taker in eminent domain is to pay "the full and perfect equivalent in money of the property taken," United States v. Miller, 317 U.S. at 373, 63 S.Ct. at 279, 87 L.Ed. 336, neither more nor less—not to use an incident of its sovereign power as a weapon with which to extort a sacrifice of the very rights the Amendment gives. True, nothing in the Amendment disfavors negotiations between the Government and those whose property it takes; here, as elsewhere, the law encourages settlement, and this may permissibly take the form of concessions, in the way of an advantageous lease or otherwise, that properly induce the condemnee to accept less than would otherwise be fair. But that principle does not remotely sanction the course of conduct practiced here—inserting a release clause in a lease that gave nothing more in the way of continued possession than the court had already given, and presenting the lease behind the back of counsel, although withdrawing the clause at the slightest show of resistance. While the leases fixed a rental, nothing suggests this was materially different from what the court would have established. Obviously the Government was not in a good position to attract new tenants. Perhaps an existing tenant would pay an outrageous rent for a while rather than have to move too precipitately, but that does not make the Government's agreement to accept the going rate a legitimate consideration for requiring the tenant to forego his right to just compensation for what the Government had taken. Whatever the Government said to these three tenants, our own duties under the Fifth Amendment forbid our enforcing the release.

d) *Procedure on remand and special problems.*

 Although what we have said should largely enable the District Court to deal with the tenants' fixture claims, the following statement may be helpful. In each case the court should ascertain what property claimed by the tenant, existing on the date of the taking, fell within the category which New York regards as neither being so "distinctively realty" as to belong to the landlord nor as being removable with such little difficulty or loss in value as to have retained its personal character. Having determined what property falls in that middle category, it should eliminate any which the tenants have chosen to remove of their own free volition. As to property so removed, the tenants are to be regarded as having waived any claim for compensation. We do not, however, mean to exclude property which a tenant removed under the practical compulsion of the Government's taking a position, improperly as we hold, that it would not compensate him for it; in such cases he is entitled to the difference between the value of the property in place and as removed, cf. United States v. Becktold Co., 129 F.2d at 481. The court should value the fixtures in accordance with the principles stated in our discussion of the Il Progresso claim—at their sound value as used equipment in place. Estimates of reproduction cost less depreciation are admissible but not conclusive. The court should not be concerned that valuation on this basis may produce a figure larger than what might be paid for the building, with all the fixtures in place, by a single purchaser who might not be interested in many of them; each owner, landlord or tenant, is entitled to the value of what the Government took from him.

 A few special problems remain. Paragraph 37 of District Council No. 37's lease with its original landlord provided:

"37. The Tenant shall do certain alteration work as per plans and specifications heretofore approved by the Landlord and the Landlord agrees to advance to the Tenant sums totalling $15,000 toward the cost of the said work, said sums to be advanced as and when the architect retained by the Tenant certifies to the Landlord that the said sums are due and owing to contractors for alteration work performed. The Tenant shall repay the said total advance of $15,000 during the period of 5

454

years commencing March 1, 1957 in equal monthly installments as additional rent."

The record is not definitive whether the portion of the $15,000 unpaid at the date of taking was considered forgiven; if it was, the award to District Council No. 37 should be reduced to that extent unless, as may well be the case, the agreed alteration work was "distinctively realty" and thus not compensable to it in any event.

■ The fixture claim of Josaldo Restaurant, Inc. for $21,682, differs from others in that Josaldo argued only that it was entitled to recover from its former landlord. Whether its theory is that the claimed sum was included in the landlord's award or that Josaldo is entitled to it by virtue of a provision in its lease is not clear. The former appears to be factually incorrect—the fee owner made a fixture claim overlapping Josaldo's, in the sum of $11,502, and Judge Knox denied it, saying "There is no evidence whatever, that the equipment, claimed by the landlord, had any market value." The latter is based, apparently, on typewritten paragraphs 39 and 42 of the lease,[10] which we read as giving the landlord an option to purchase the fixtures at the end of the lease term, whenever that occurred, but not as otherwise altering the rights of the parties. Judge Knox found simply that "Although the landlord had an option to purchase such equipment, such option was never exercised." Although Josaldo did not contend in argument that it was entitled to an

award against the United States, the judgment below contained a denial of a fixture claim by Josaldo against the United States, and Josaldo's notice of appeal states that it "appeals from each and every part of the aforesaid judgment on the law and on the facts." Josaldo has thus preserved its claim if it ever raised one; the doubt whether it did stems from the fact that its original demand, for $21,682, was contained in an affidavit of its president, opposing its landlord's motion for release of the sum deposited in court to cover parcel 14, in which Josaldo said it "has a good and meritorious claim against petitioners," i. e., its landlord. However, the affidavit also stated that

On February 1, 1960 JOSALDO RESTAURANT INC. was the owner of certain trade fixtures contained in the said premises and the said corporation is asserting a claim for payment for the taking of the said trade fixtures in the sound value of $21,682.

We think this sufficed to raise a claim against the United States.

■ Josaldo makes one other demand against its landlord, contending that by virtue of paragraph 49 of their lease, set out in relevant part in the margin,[11] it is entitled to a $4,000 payment out of the landlord's award. Both the quoted language and other provisions not quoted make it plain that this referred only to a voluntary sale.

On the appeal of Universal Brush from the denial of its claim to a portion of the award to its landlord, we affirm; Uni-

10. "39. It is understood and agreed between the parties hereto that as a condition of the owner granting this lease the Tenant herein states and agrees that he will spend a sum of about Seven Thousand ($7,000.) Dollars for improvements in the demised premises. The Tenant agrees forthwith on the signing of this lease to proceed expeditiously with the alterations mentioned hereunder."

"42. The Landlord reserves the right herein at the conclusion of this lease or any prior conclusion for any reason whatsoever to purchase the fixtures and equipment as will be contained in the premises

at the conclusion of the alterations contemplated by the Tenant at a price to be determined by what a recognized fixture and equipment manufacturer would pay for the same."

11. "49. In the event that the sale of the premises shall be made, as hereinbefore provided, after the first five years of the term herein, the landlord shall * * * have the right to cancel this lease * * * upon the payment to the tenant of the following sums of money: * * * if it is cancelled any time in the seventh year the sum of Four Thousand ($4,000.) Dollars * * *."

versal's rights are solely against the United States.

The judgment is affirmed in part, and is reversed in part and remanded to the District Court for proceedings not inconsistent with this opinion.