RICHMOND ELKS HALL
ASSOCIATION, Plaintiff,

v.

RICHMOND REDEVELOPMENT AGEN-
CY and the City of Richmond, Defend-
ants, (Richmond Redevelopment Agen-
cy, Appellant.)

RICHMOND ELKS HALL ASSOCIA-
TION, Plaintiff-Appellant,

v.

RICHMOND REDEVELOPMENT
AGENCY and the City of
Richmond, Defendants.

Nos. 75–2520 and 75–2491.

United States Court of Appeals,
Ninth Circuit.

Sept. 30, 1977.

Ronald J. Mulcare (argued), Turner & Mulcare, San Mateo, Cal., Bold and Polisner, Walnut Creek, Cal., Jackson and Gughemetti, Burlingame, Cal., for Richmond Elks Hall Assn.

William R. Edgar (argued), Herman H. Fitzgerald, Fitzgerald, Johnson, Berg and Edgar, San Francisco, Cal., for Richmond Redevelopment Agency.

Before CHAMBERS and TRASK, Circuit Judges, and THOMPSON,* District Judge.

TRASK, Circuit Judge:

This case involves an appeal by Richmond Redevelopment Agency (Agency) from a final judgment of the United States District Court for the Northern District of California, ordering Agency to pay to Richmond Elks Hall Association (Elks) a certain sum of money as just compensation for a de facto taking in inverse condemnation of certain property owned by Elks. The judgment ordered Elks, upon payment, to convey the property to the Agency by quitclaim deed. Elks cross-appeals from the judgment which fails to award Elks its litigation expenses, including attorneys' fees and expert witness fees.

The district court set forth its findings of fact in a document filed September 17,

* Honorable Gordon Thompson, Jr., United States District Judge, Southern District of California, sitting by designation.

1974. While Agency challenges several of these findings of fact as clearly erroneous, we have carefully examined the trial court's findings and uphold the same on appeal. The facts underlying this dispute may be summarized as follows.

Elks is the record owner in fee simple of certain improved real property in the City of Richmond, California. The improvement consists of a four-story building with a basement, the first story of which had been partitioned and leased to commercial tenants under successive five-year leases.

In September 1959, the City of Richmond included Elks' property within an area which it declared blighted and in need of redevelopment. Agency, created by the City for the purpose of directing the redevelopment and at all times in question possessing the power of eminent domain, subsequently set about formulating the necessary plan for redeveloping the area. Agency's plan was approved by the City of Richmond on May 23, 1966.

Under provisions of the plan, which was given wide publicity, properties within the project area were placed into two classifications: (1) acquisition parcels, and (2) owner participation parcels. The plan stated that Agency "shall" acquire all properties categorized as owner participation parcels if not covered by an owner participation agreement. Under the terms of the proposed owner participation agreement, the owner was required to rehabilitate the structure on his property at his own expense to the satisfaction of Agency and its design policy.

In accordance with the plan, Elks was informed by letter dated February 21, 1967, that it could retain its property if and only if it signed an owner participation agreement. Elks, after determining that the expense of rehabilitating its building would be excessive, elected not to enter into an owner participation agreement. Hence, it reasonably understood that its property would be acquired by Agency.

As part of its plan, Agency developed a timetable for acquiring the properties located within the project area. All properties were to be acquired within four years, and the schedule showed Elks' property to be acquired within two years.

Agency recorded its redevelopment plan and its covenants, conditions, and restrictions on all properties located within the project area. On August 16, 1966, Agency passed and recorded a resolution declaring the public use, purpose, and necessity for the acquisition by condemnation of all redevelopment area properties, including the subject property. Said resolution was used as authority for the condemnation of properties in the project area, including properties classified as owner participation parcels under the plan.

In the latter part of 1966, Agency, in executing the plan, commenced the acquisition of project area properties and the demolition of improvements located thereon. The commencement of the project resulted in the unavailability of property insurance (except upon the payment of a high risk premium), plate glass window insurance, and loan money on properties within the redevelopment area.

On October 18, 1966, Agency passed a resolution stating that an owner or tenant of property shall waive any right to compensation for any remodeling or for any increase or enhancement of the value of the property as a result of remodeling. Thereafter, in 1967, a commercial tenant of Elks' property was told by Agency that Elks' property would be acquired within two years, and that the tenant, as a condition to the improvement of his leasehold interest, would have to waive the value of any improvements placed upon the property.

In May 1967, the leases between Elks and its commercial tenants expired. Elks reasonably and justifiably understood that Agency would soon acquire its property, and thus refused to offer tenancies in excess of month-to-month. During this period Elks' commercial tenants experienced a decrease in their gross sales, a direct result of Agency's acquisition, demolition, and relocation program. Because of the decline in sales, most of Elks' tenants vacated the subject property in 1967, and consequently Elks' rental income was cut to less than one-third of the income level existing prior

to the institution of Agency's redevelopment plan.

In July 1968, Agency entered into an option agreement with a developer whereby Agency obligated itself to do all acts and things necessary to acquire title to the optioned property and convey it to the developer for the construction of a shopping center. Elks' property was located within the area optioned by Agency to the developer. The option was for one year, but was thereafter extended for an additional year. Wide publicity was given to the existence of the option and the proposed shopping center development, including the fact that Elks' property would become a parking lot for the center.

By the end of 1969, more than 83 percent of the property to be acquired under the plan had been purchased by Agency. However, after this time there were very few acquisitions because the Department of Housing and Urban Development (HUD) halted its funding of the project.

In 1970, Agency undertook street improvements within the redevelopment area. As a result of this street construction the basement of Elks' property was flooded at various times until 1972. Part of the street improvement required the sealing off of portions of Elks' basement.

In July 1972, Agency informed Elks that it preferred not to acquire the property.

The district court found that because of Agency's actions, the subject property became unsaleable in the open market and its use for its intended purposes became severely limited. Therefore, the district court held that the natural consequence of Agency actions was the taking of Elks' property by inverse condemnation in contravention of the Fifth and Fourteenth Amendments of the United States Constitution. The court below indicated that the taking occurred on or about July 23, 1968, the date Agency entered into the option agreement with the developer. The district court awarded Elks the fair market value of its property ($355,000) plus interest, and ordered Elks, upon payment of the judgment award, to convey to Agency by quitclaim deed all its right, title, and interest in the subject property. The district court denied Elks' motion for litigation expenses.

Agency challenges the district court's conclusion that, given the facts set forth above, there was a compensable taking under the Fifth Amendment. This challenge cannot succeed.

■ When a public entity *acting in furtherance* of a public project directly and substantially interferes with property rights and thereby significantly impairs the value of the property, the result is a taking in the constitutional sense and compensation must be paid. *See, e. g., Drakes Bay Land Co. v. United States,* 424 F.2d 574, 584, 191 Ct.Cl. 389 (1970); *Foster v. City of Detroit,* 254 F.Supp. 655 (E.D.Mich.1966), aff'd, 405 F.2d 138 (6th Cir. 1968); *Madison Realty Co. v. City of Detroit,* 315 F.Supp. 367 (E.D.Mich.1970).

"[T]o constitute a taking under the Fifth Amendment it is not necessary that property be absolutely 'taken' in the narrow sense of that word to come within the protection of this constitutional provision; it is sufficient if the action by the government involves a direct interference with or disturbance of property rights. See e. g., *Pumpelly v. Green Bay Co.,* 13 Wall. 166, 80 U.S. 166, 20 L.Ed. 557 (1871); *United States v. Lynah,* 188 U.S. 445, 23 S.Ct. 349, 47 L.Ed. 539 (1903); *United States v. Cress,* 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746 (1917). Nor need the government directly appropriate the title, possession or use of the properties . . ." *R.J. Widen Co. v. United States,* 357 F.2d 988, 993, 174 Ct.Cl. 1020 (1966).

■ In determining what property rights exist and therefore are subject to taking under the Fifth Amendment, federal courts look to local state law. *United States v. Certain Property, Etc.,* 306 F.2d 439, 444 (2d Cir. 1962). Under California law the rights to use, sell, lease, and encumber real property are property rights. *See, e. g., Bias v. Ohio Farmers Indemnity Co.,* 28 Cal.App.2d 14, 81 P.2d 1057 (1938); *Centoni v. Ingalls,* 113 Cal.App. 192, 298 P. 47 (1931); *Winchester v. Winchester,* 175 Cal. 391, 165 P. 965 (1917). Elks had these rights prior to redevelopment. However, as

a result of Agency action, Elks' property was rendered unsaleable in the open market; its uses were severely limited by Agency; commercial lenders refused to make loans on the subject property; and Elks' peaceful enjoyment and its right to all rents and profits from the property were substantially impaired. Given these consequences of Agency action, we conclude that Agency's interference with Elks' property rights was direct and substantial, and that the result of this interference was a significant reduction in the value of the subject property. Therefore, we hold that Agency effected a compensable taking under the Fifth and Fourteenth Amendments of the United States Constitution.

Agency relies on two Sixth Circuit decisions, *Woodland Market Realty Co. v. City of Cleveland*, 426 F.2d 955 (6th Cir. 1970), and *Sayre v. City of Cleveland*, 493 F.2d 64 (6th Cir.), *cert. denied*, 419 U.S. 837, 95 S.Ct. 65, 42 L.Ed.2d 64 (1974), in contending that no taking of Elks' property occurred. Both cases are distinguishable from the instant case. While *Woodland Market Realty* and *Sayre* address the issue of taking in the urban renewal setting, neither case involved property designated for condemnation by the public authority. In *Woodland Market Realty*, the property at issue was included within the proposed project area but was excluded prior to any official action and was never a part of the project as established by ordinance. "Rather, it at all times remained adjacent to but outside the project." *Woodland Market Realty, supra*, at 957. In *Sayre*, the properties under examination were never designated for appropriation for the urban renewal project. *Sayre, supra*, at 68. The instant case stands in stark contrast. Elks' property was included within the redevelopment area as described in the urban renewal plan adopted by city ordinance in 1966, and was specifically designated for acquisition by the terms of that plan. Further, such designation was subsequently reiterated by several official Agency actions. There can be no question in this case that Agency intended to appropriate Elks' property. Hence, the cases relied on by Agency are inapposite.

The factual setting in *Foster v. City of Detroit, supra*, another case arising within the Sixth Circuit, is strikingly similar to the instant dispute. In *Foster*, after the City of Detroit instituted condemnation proceedings against certain blighted property, the following events transpired: plaintiffs-property owners were given notice of acquisition; condemnation and clearance were initiated as to some of the properties but not others; commercial rental receipts declined; insurance became difficult to obtain; plaintiffs-property owners were informed that no compensation would be paid for improvements; and the saleability of the property was impaired. Given these facts, the District Court for the Eastern District of Michigan held that plaintiffs' properties had been taken within the meaning of the Fifth Amendment. 254 F.Supp. at 665–66. Our holding in the instant case—that Elks' property was taken in contravention of the Fifth Amendment—evidences our agreement with the *Foster* decision.

Agency raises in cursory fashion several additional objections to the district court's finding of a compensable taking. Only two of them merit attention here. First, Agency cites *Wilfong v. United States*, 480 F.2d 1326, 202 Ct.Cl. 616 (1973), and *National By-Products, Inc. v. United States*, 405 F.2d 1256, 186 Ct.Cl. 546 (1969), for the proposition that governmental interference with a private citizen's property rights must be permanent before a compensable taking has occurred. Agency submits that its interference with Elks' property rights has not been permanent, and therefore that no taking has occurred which would require compensation under the Constitution. Second, Agency argues that the redevelopment plan under examination here is a proper and lawful exercise of the police power of the State. Consequently, Agency contends, its actions did not constitute a taking of property in violation of the Fifth Amendment.

■ Neither of Agency's contentions dissuades us from our holding that a compensable taking has been effected in this case. Agency, citing *Wilfong, supra*, and *National By-Products, supra*, urges that permanence of governmental interference is a prerequi-

site to a compensable taking under the Fifth Amendment. The requirement of permanence is most prominent in flood (*National By-Products*) and overflight (*Wilfong*) cases. Such cases involve an act (aircraft overflight) or an event (a flood) which, by its nature, can be easily terminated or transpires over a short period of time. *Wilfong v. United States, supra*, at 1330. Given such circumstances, the courts have required that the effect of the act or event create an "intermittent interference that is either permanent or at least of a prospective duration so indefinite as to be constructively permanent." *Id.* at 1328. The facts of the instant case do not present an act or event that can be removed "conveniently, quickly and at will." *Id.* at 1330. Further, the result of Agency action has not been intermittent. Agency's interference with Elks' property rights commenced in 1966, and thereafter such interference has been continuous. Under these circumstances, we hold that Elks has not failed to meet a permanency requirement which failure would excuse Agency from paying for the taking it has effected.

■ Regarding Agency's argument that it acted pursuant to the police power of the State and therefore is not liable for its taking of Elks' property, we observe that the very authority cited by Agency, *Berman v. Parker*, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954), refutes its contention. *Berman* involved the rights of property owners whose properties were taken by a redevelopment agency pursuant to the exercise of the State's police power. Under such circumstances the Court observed that "[t]he rights of these property owners are satisfied when they receive that just compensation which the Fifth Amendment exacts as the price of the taking." *Id.* at 36, 75 S.Ct. at 104. It is clear from *Berman* that a governmental agency acting pursuant to the State's police power must pay just compensation for any taking it effects. Therefore, assuming *arguendo* that Agency in the instant case exercised legitimate police power, it still must pay for its taking of Elks' property.

■ Agency contends that even if the district court's judgment as to inverse con-

demnation is affirmed, since Elks' complaint alleged it was the owner of the subject property in fee simple and the district court so found, Agency is entitled to a warranty deed guaranteeing fee simple title rather than the quitclaim deed provided for in the judgment below. We disagree with Agency's contention and uphold that portion of the district court's judgment requiring a quitclaim deed. This court observed in *Hawaiian Gas Products v. Commissioner of Int. Rev.*, 126 F.2d 4, 5 (9th Cir.), *cert. denied*, 317 U.S. 653, 63 S.Ct. 48, 87 L.Ed. 525 (1942), that "the Sovereign can get no greater title than that held by the former owner." The sole plaintiff in this case is Elks. No claim was asserted at trial on behalf of any other party. Accordingly, the compensation awarded is solely for the interest of Elks, and Elks should not be required to give a warranty deed guaranteeing title against the claims of possible third parties. The quitclaim deed described in the district court's judgment will convey to Agency the entire interest to which it is entitled under the proceedings of this lawsuit. *See United States v. 7.2 Acres of Land, etc.*, 117 F.Supp. 499 (E.D.Tenn.1953).

In its cross-appeal, Elks contends that the district court erred as a matter of law by refusing to award to Elks its litigation expenses. Elks' principal argument in support of this contention is grounded on federal law, particularly section 305 of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (the Act) and 24 C.F.R. § 42.145(a). Section 305 provides in part as follows:

"Notwithstanding any other law, the head of a Federal agency shall not approve any program or project or any grant to, or contract or agreement with, a State agency under which Federal financial assistance will be available to pay all or part of the cost of any program or project which will result in the acquisition of real property on and after [the effective date of this title] January 2, 1971, unless he receives satisfactory assurances from such State agency that—

    *    *    *    *    *    *

"(2) property owners will be paid or reimbursed for necessary expenses as speci-

fied in sections [303 and 304, 42 U.S.C. §§] 4653 and 4654." 42 U.S.C. § 4655. Section 304, 42 U.S.C. § 4654, referred to in section 305 above, provides for the awarding of attorneys' fees to successful plaintiffs. Section 42.145(a), 24 C.F.R., provides in pertinent part:

"The State agency shall reimburse the owner of any real property for the owner's reasonable costs, disbursements, and expenses of litigation, including attorney, appraisal, and engineering fees, actually incurred because of condemnation proceedings, if:

\*  \*  \*  \*  \*  \*

"(3) A court of competent jurisdiction renders a judgment in favor of the owner as plaintiff in an inverse condemnation proceeding or the State agency effects a settlement of such proceeding."

Elks argues that section 305 of the Act and 24 C.F.R. § 42.145(a) evidence a "mandate" by Congress that litigation expenses shall be awarded to successful plaintiffs in inverse condemnation actions initiated against federally-assisted state redevelopment agencies. Based upon this mandate and the fact that Elks succeeded in its action against Agency, Elks believes that it is entitled to its litigation expenses.

■ In rebuttal, Agency urges that Elks has no federal statutory right to its litigation expenses because the approval and funding by HUD of the instant project and the taking of Elks' property predate the effective date of the Uniform Relocation Assistance and Real Property Acquisition Policies Act. The approval by HUD of the instant project, including its funding, was given on August 15, 1966. The district court specifically found that the taking of Elks' property occurred on July 23, 1968. Further, HUD funds were withdrawn from the project on December 23, 1969. Each of these events preceded the effective date of the Act, which is January 2, 1971. Section 305 and 24 C.F.R. § 42.145(a) deal with "acquisition[s] of real property on and after" January 2, 1971. Elks' property was acquired several years before this date. Therefore, to the extent that these sections create a statutory right to litigation ex-

penses, a point that is debatable and not addressed here, we hold that they do not create a right to such expenses in this case.

■ Elks also seeks to justify its demand for litigation expenses by alleging that it has performed the function of a private attorney general and by urging that the equitable powers of the federal courts permit such an award in this case. Neither contention can withstand scrutiny in light of the Supreme Court's decision in *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). The Supreme Court in *Alyeska* specifically rejected the judicially-created private attorney general theory, *id.* at 269, 95 S.Ct. 1612, and reaffirmed the traditional American rule that "the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Id.* at 247, 95 S.Ct. at 1616. While the Court recognized a limited number of circumstances where reasonable attorneys' fees are awarded to the prevailing party in the absence of an express statutory provision, *id.* at 257–59, 95 S.Ct. 1612, Elks has not demonstrated that the instant case fits within any of the enumerated exceptions.

■ Elks next argues that it is entitled to its litigation expenses under the Fifth Amendment's guarantee that private property shall not be taken for public use without just compensation. We reject Elks' argument which conflicts with the Supreme Court's declaration in *Dohany v. Rogers*, 281 U.S. 362, 368, 50 S.Ct. 299, 302, 74 L.Ed. 904 (1930):

"Attorneys' fees and expenses are not embraced within just compensation for land taken by eminent domain."

■ Finally, Elks argues that if this court finds that federal law and policy are not controlling, then we must look to California law which specifically awards costs and expenses to owners that obtain judgments in inverse condemnation actions against public entities. Cal.Civ.Proc.Code § 1036 (West). In rejecting this contention, the district court relied on the Supreme Court's decision in *F.D. Rich Co. v. Industrial Lumber Co.*, 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974), which reversed a

decision of this circuit awarding attorneys' fees in a suit brought under provision of the Miller Act. In *F.D. Rich Co.*, the Supreme Court observed that:

"[t]he Miller Act provides a federal cause of action, and the scope of the remedy as well as the substance of the rights created thereby is a matter of federal not state law. Neither respondent nor the court below offers any evidence of congressional intent to incorporate state law to govern such an important element of Miller Act litigation as liability for attorneys' fees." *Id.* at 127, 94 S.Ct. at 2164.

We agree with the district court that the Supreme Court's reasoning in *F.D. Rich Co. v. Industrial Lumber Co., supra*, controls the case before us. Elks brought this suit under the Fifth Amendment of the United States Constitution. Elks has made no showing of congressional intent to incorporate state law into suits filed under the Fifth Amendment. Therefore, we hold that state law is inapplicable in determining Agency's liability for Elks' litigation expenses.

The judgment of the district court is affirmed.