## UNITED STATES v. LAMBERT.

### No. 12.

Circuit Court of Appeals, Second Circuit.

Dec. 29, 1944.

470

Jerome J. Licari, of Brooklyn, N. Y., for appellant.

Vernon L. Wilkinson, of Washington, D. C., for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from a judgment of condemnation of certain lands in Suffolk County, New York; the only issue is the amount of the award. As to this the owner alleges two errors: (1) That the court made the award itself, instead of appointing commissioners, as the New York law required (§ 14, Condemnation Law, Consol. Laws, c. 73); (2) that the award was too low. The facts were as follows. The land in question consisted of three plots—designated "A", "B" and "C"—; two of which —"A" and "B"—were adjacent to land owned and in the possession of the Republic Aviation Company, which had an airplane factory nearby; and the third—"C" —was adjacent to "B". The Republic company was making airplanes for the government and needed more land, which the government undertook to provide for it by condemnation. "Plot A," of about seventeen acres, was presumably needed for building purposes; the others for the expansion of the testing grounds. The land was some four or five miles from the south shore of Long Island, in open country, not much neighboring land was used for residence purposes; it could be used for truck farming, possibly it might be developed for residences; but the best chance was that it might be needed for airfields, factories, or other industrial uses. Upon an amended petition of the United States filed September 12, 1940, judgment of condemnation issued on January 20, 1942. Shortly thereafter the plaintiff moved to dispense with the appointment of commissioners, and that the court should assess the value of the premises. Over the defendant's opposition, the court entered such an order on March

31, 1942, and the cause came on to be tried in September of that year. The defendant, Lambert, called two expert witnesses— Edwards and Coogan—and the petitioner called one. (Kay, the defendant who has not appealed, also called an expert as to "Plot B.") As is usual in such cases, the estimates varied greatly. "Plot A" the petitioner's expert assessed at $10,260; Lambert's witnesses, at about $42,000; and the court awarded $13,000. "Plot B" the petitioner's witness assessed at about $60,000; the average of the three witnesses for Lambert and Kay was about $340,000; and the court awarded $88,835. "Plot C" the petitioner's witness assessed at $5,742; the average of Lambert's witnesses was about $48,000; and the court awarded $12,919.50. On cross examination it developed that the defendant's witnesses had in part relied upon six sales, the price per acre of which ran from $4,000 to $800. The first of these was of a small plot of less than five acres, sold by the Republic company to the Fairchild company—a manufacturer of airplane engines—which needed room to expand its factory. This sale was under some compulsion by the War Department, and, since the plot was a corner of the Republic company's testing field, the price was in part severance damage. The next was a small corner plot of half an acre bounded by two highways, which sold for $2,000. The next was a plot of sixty-four acres, north of "Plot B" and east of "Plot A"; it was part of the property sold by the grantor of the Republic company to that company. This sale included the airplane factory and other land, and there was testimony that a single price, fixed for the whole property, had been arbitrarily divided, the parties making no effort to allocate to the parcel in question its actual value. The next sale was of a plot of fifty-three acres, sold by one, Neder, to the Grumman company, for expansion of its plant, at an average price of $1,075 an acre. The land was at some distance from the plots here in question; it was developed farm land, and had upon it a house, a garage and a barn, as to the separate value of which there was no testimony. Moreover, it had an extensive frontage on the Long Island Railroad. The next sale was of ninety acres, a quarter of a mile away, allotted for residential purposes, in better developed surroundings; it sold for $800 an acre. The next sale was of eighteen acres which had been sold three times in 1940—the last time for $1,222; a

property with extensive railroad frontage in a business district, re-zoned for residential use. The last was a purchase by the United States from a cemetery company of a parcel of 175 acres which was to be continued in that use. The price was $1,140 per acre, but special considerations determine the price of all such property. Cross examination of the petitioner's witness developed sales of only two parcels: one a plot of 138 acres which sold for $290 per acre, about a mile and a half away from the property condemned, and in a residential district. The other sale was of a five acre plot, sold for $570 per acre; this was near the property condemned, but it was already in use for business and industrial purposes. The condemned property had no railroad frontage, and was some distance from the railroad track; "Plot B" and "Plot C" had been zoned for residential use.

■ The first question is whether it was proper for the court to assess the awards without appointing commissioners. Section 258 of Title 40 U.S.C.A., declares that the "practice, pleadings, forms and modes of proceedings" in condemnation proceedings must "conform, as near as may be" to those which the state law prescribes, and we will assume, arguendo, that on March 31, 1942, when the district court ordered the case to be tried by a judge, the state law required condemned property to be assessed by commissioners. (Section 13 of the New York Condemnation Law is mandatory, and covers condemnation by the State.) It is true that other statutes dispense with commissioners; but these cover special situations: (1) land in the City of New York (Judiciary Law, Consol.Laws, c. 30, § 148); (2) land in the Adirondack and Catskill Reserves (Conservation Law, Consol.Laws, c. 65, § 59(7); (3) land for prisons (Correction Law, Consol.Laws, c. 43, § 21(12); (4) or for schools and the like (Education Law, Consol.Laws, c. 16, § 95-a(12). The plaintiff argues that these are a sufficient indication of the state law to permit us to say that conformity, "as near as may be," allows a district court to accept them as its guide, though they would not apply to the same land in a state court proceeding. We need not so decide; again, arguendo, we will assume the point in the defendant's favor. Nor did § 51 of the State Law of New York, Consol.Laws, c. 57, bear out the plaintiff, as it stood on March 31, 1942, although it specifically covered condemnation by the United States. Not only did it generally provide that such condemnations should be in conformity with the condemnation law; but, even when the seizure was in time of war, it specifically required the appointment of commissioners: "No petition shall be necessary to institute such proceeding and the supreme court shall * * * appoint three commissioners of appraisal as provided in the condemnation law." But on May 11, 1942, § 51 was amended, and the passage just quoted has since then read: "No petition shall be necessary to institute such proceeding and the supreme court shall * * * determine the compensation * * as provided in the condemnation law or appoint three commissioners of appraisal as provided in such law." Thus, although it is possible that in time of peace commissioners must still assess property condemned by the United States, that is no longer true in time of war. The judgment of condemnation was entered after December 7, 1941, as has already appeared; hence, if the United States proceeded in its own courts, as § 257 of Title 40 U.S.C.A. allowed, it might also ask the judge to make the award. It may be answered that that part of § 51 which we have quoted refers to a seizure by an "agent" of the United States, and does not presuppose a judgment of condemnation, the procedure here adopted. There need not, however, be a step by step correspondence between the practice in the district court and that prescribed by state law; § 258 gives some latitude, as did its prototype, the old Conformity Act, R.S. § 914, 28 U.S.C.A. § 724. It is enough that the state practice provided that judges as well as commissioners might appraise the land when the United States condemned it. And so, even though we assume that the order of March 31, 1942, was invalid when it was entered, the amendment of May 11, 1942, made it good; for the formality of entering it again was unnecessary, nothing having been done in the action meanwhile.

■ Coming next to the amount of the awards, we must affirm the findings unless they are "clearly erroneous." The Rules of Civil Procedure apply to appeals in condemnation proceedings (Rule 81(a) (7) and Rule 52(a), so far as it fixes the conclusiveness of findings, is a rule of appellate procedure. Moreover, the valuation of real

property is an issue particularly for the trial court, for, when all is said, any conclusion can never be more than speculation. Each piece of land is sui generis; there are no others like it, and without others there can be no true market, as there is for fungibles. Sales of similar parcels will certainly help; we can use them as checks or limits up and down, on the theory that a buyer might accept other parcels as substitutes, but they never are equivalents. Hence we think, quite contrary to the defendant's argument, that a judge is wise, in deciding this issue, to be guided by the impression which the experts make upon him. So far as he is not, he will have to put himself in the position of an expert; and while, to some extent that is something which in the end he cannot escape, it is usually safer, so far as possible, to depend upon the apparent frankness, moderation and sagacity of the witnesses. In the case at bar, it is true that the judge's award was far below that of the defendant's experts; we cannot say upon the cold record that we should not in his place have been moved to go higher, but from what we have already said of the specific sales it appears that for one reason or another, little reliance need have been placed upon them. Either the parcel was very small; or the price was fixed by exceptional pressures, or not at all upon value; or the land was at some distance from the plots; or it was in a tract that had already come into some other use. The judge believed that, "considered as unproductive acreage, the basic value of $300 per acre is fair"—leaving out a part of "Plot A", because of its location on a street corner, which he valued at $1,000 an acre. To this "basic value" he added fifty per cent for the possibility that the plots might have been required for an airfield, as in fact they had been. That was the factor on which the defendant's experts especially relied in their appraisals; and that the defendant especially presses upon us on this appeal. She argues that there were already a number of airplane makers in the neighborhood; that the land was fitted for that purpose, as was proved by the condemnation itself; and that, being so situated, an owner could force an airplane maker to pay much more than fifty per cent above its value as farm land.

These particular plots were in a special position. It is true that they were the only available parcels which the Republic company could use for the needed extension of its testing field; it is also true that, had it attempted to get the land by purchase, the defendant might have been able to drive the price higher than those which her experts set. Moreover, since the land was particularly adapted for an airfield not only in its surface, but by its propinquity to the airplane factory for an airfield of that factory, that was an increment which had to be paid for. Boom Co. v. Patterson, 98 U.S. 403, 408, 25 L.Ed. 206; Shoemaker v. United States, 147 U.S. 282, 304, 305, 13 S.Ct. 361, 37 L.Ed. 170; United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 77, 78, 33 S.Ct. 667, 57 L.Ed. 1063; Olson v. United States, 292 U.S. 246, 257–259, 54 S.Ct. 704, 78 L.Ed. 1236. No one can of course deny that the Republic company might not in time have wished to expand its plant; though that was merely a possibility, and possibilities are ordinarily not counted. So far as it should count at all, we cannot say that what the judge allowed was not enough to balance that possibility. But we can and do hold that the opportunity open in general to other land in the neighborhood for use as airfields—however proper a factor in appraising them—was not to be included in appraising the defendant's plots. For, although their proximity to the Republic company made that company a possible customer, it effectively excluded any other customer who might wish airfields. If the defendant did not sell to the Republic company, she would never sell to anyone else for an airfield. It follows from this that the "airfield factor," so to speak, could be relevant only in so far as the defendant proved that the Republic company was likely to expand before the War Department intervened. She did not do so. On the contrary "negotiations for the increase of the plant started in July, 1940 * * * an expansion of the plant at the request of the Government." Before then there had been no attempt "to acquire additional land for expansion." We need do no more than refer to United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336, for the proposition that any increase occasioned by the demands of the War Department itself should not have entered into the award; no owner can profit by exacting anything from the condemner for the value in use which condemnation will bring to him. Thus, the whole argument based upon the element of the adaptability of the plots for an airfield, disappears. So far as we can

sec, the defendant received all that she proved that she was entitled to; at least we are not convinced that she has proved the award to be "clearly erroneous."

Judgment affirmed.