UNITED STATES, Appellee,

v.

GLANAT REALTY CORP. and Eastern Suffolk Concrete and Asphalt Corp., Appellants.

No. 144, Docket 25804.

United States Court of Appeals Second Circuit.

Argued Jan. 13, 1960.

Decided March 15, 1960.

Albert H. Buschmann, Jamaica, N. Y., for appellant Eastern Suffolk Concrete & Asphalt Corp.

Julius Winn, Sherman & Goldring, New York City, for appellant Glanat Realty Corp.

S. Billingsley Hill, Atty., Dept. of Justice, Washington, D. C., Perry W. Morton, Asst. Atty. Gen., Harry T. Dolan, Sp. Asst. to the Atty. Gen., Roger P. Marquis, Atty., Dept. of Justice, Washington, D. C., for appellee.

Before HAND, HINCKS and WATERMAN, Circuit Judges.

HAND, Circuit Judge.

These appeals are to review awards of compensation for the condemnation of easements above real property owned by two corporations in Suffolk County, New York. We shall speak of the Eastern Suffolk Concrete and Asphalt Corp. as "Eastern Suffolk" and the Glanat Realty Corp. as "Glanat." The only issue on the appeal is whether the awards, made by Inch, J., after a trial without a jury, were too small. That made to "Eastern Suffolk" was $8,572; that made to "Glanat" was $3,778, both with interest.

When the Air Force Base in Suffolk County was originally constructed in 1942, it had a "runway," 5,000 feet long, which was extended by 2,000 feet in 1953, and for which the Air Force acquired, not only the right to the runway, but an easement over the land several thousand feet beyond its end, allowing airplanes to pass free from obstructions in the air space above a "glide angle plane": i. e., a plane rising at a prescribed increasing

height beyond the end of the runway. In 1957 the Air Force decided to extend the runway by 2,000 feet, and found it necessary to clear the land in the "approach zone" from all obstructions of every kind. To do so it lowered by twenty-five feet the "glide angle plane" easement of 1953, but did not include the right of planes to pass through the space below the former "glide angle plane." To free from obstruction the space between the old and the new "glide angle planes," it was necessary to cut off the tops of seven hills that intruded above the new "plane," and on May 1, 1957 the Air Force filed a "taking" of the "perpetual right to remove, to raze, to destroy and to prohibit  \*  \*  \* structures  \*  \*  \* land, hills  \*  \*  \* and other materials  \*  \*  \* extending above the approach glide surface," together with other ancillary privileges not necessary to set forth.

The soil removed from the hilltops contained gravel and sand that was useful in the manufacture of concrete and asphalt, and that, as it lay in place, had a value and could be sold by the cubic yard. By 1955 "Eastern Suffolk" had a plant in operation a short distance away from the premises in question in which it made concrete and asphalt, for which the gravel and sand could be obtained from the land subject to the easement. "Glanat" owned two of the seven hills that intruded into the new "glide angle plane." Judge Inch awarded compensation based on the decrease in value of the land, caused by the lowering of the "glide angle plane," as estimated by the Air Force's expert witness, Smith, a real estate dealer who lived in the vicinity. He computed the awards on the values of the land, if used for building purposes. He assumed that the new easement (that of 1957 (depreciated some parts of land made subject to it by eighty per cent and other parts by two and a half per cent, and he made no added allowance for the loss of the gravel and sand contained in the soil taken from the intruding hilltops, which the Air Force, disregarding a request of "Eastern Suffolk," used to

level the extension of the runway. Both appellants insist that this soil was their "personal property," to which the Air Force was not entitled under the terms of the "taking," and that an independent award should have been made for it. They also challenge the value fixed for the land subjected to the increased burden of the 1957 easement. We shall first consider the argument that there should have been an allowance for the gravel and sand carried away and used as "fill" for the extension of the runway.

We agree that after the hilltops had been cut off and the soil had been pushed aside, it and the gravel and sand it contained became personalty, but that seems to us irrelevant because the right to "remove" its components was condemned while the soil was still in situ. The seizure of course entitled the owners to compensation for the components, but their value was included in the difference between the value of the land before the "taking" and its value thereafter. Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236; Georgia Kaolin Co. v. United States, 5 Cir., 214 F.2d 284, 286. It goes without saying that any known contents of land will be an element of its value before the soil is displaced, and will form a part of its value if it is condemned; but we can see no reason why when, as here, the contents remain undisturbed at the time of "taking," it is necessary to compute the value in two parts. We do not mean that it would necessarily be improper so to compute the value, but that method has been discountenanced, not only in Georgia Kaolin v. United States, supra, but in United States v. Meyer, 7 Cir., 113 F.2d 387, 397 and United States v. Certain Parcels of Land, 5 Cir., 149 F.2d 81, 82, as likely to introduce speculative factors. At any rate in the case at bar the Air Force's expert repeatedly testified that in his opinion the value of the land for residential purposes was greater than for any other purpose; and, if that is correct, the value of the gravel and sand in situ was immaterial.

The appellants ask us to hold that Judge Inch's acceptance of this valuation was "clearly erroneous." "Eastern Suffolk" especially presses the fact that the affected land was near to its plant, and that the sand and gravel were, so to say, raw material for its product. We will assume for argument that this would have been a legitimate factor in any award, had there not been other ample sand and gravel available in the neighborhood. The appellants assert that it was an unwarranted assumption that the adjacent land was as much infiltrated with sand and gravel as the land beneath the easement; but that they did not prove; and the burden of establishing the value of the land taken is on the owner. United States ex rel. Tennessee Valley Authority v. Powelson, 319 U.S. 266, 273, 274, 63 S.Ct. 1047, 87 L.Ed. 1390; Westchester County Park Comm. v. United States, 2 Cir., 143 F.2d 688, 692. The evidence was that the land subject to the easement was to all outward seeming the same as the neighboring land. It was undulating and barren, for the most part without vegetation except for scrub oaks, being a part of the terminal moraine of an ancient glacier that once covered the territory north of Long Island. The hilltops cut off may indeed have contained a larger proportion of sand and gravel than the adjacent land, and the "borings" made by the Air Force expert may not have been reliable samples of the soil composition elsewhere. All we know is that at certain places he looked at cuts in the adjacent land, and that these appeared to be the same as his "borings" on the land subjected to the easements. In short, the record makes it probable, though not certain, that there was a sufficient supply of material for the "Eastern Suffolk" plant in the adjacent lands. So much for the supposititious increase in value of the sand and gravel taken, which "Eastern Suffolk" computes at over $380,000.

There remains the valuation of the land for residential purposes which both appellants challenge—"Glanat," more specifically than "Eastern Suffolk." It is true that one of the appellants' expert witnesses testified that the land was worth $500 an acre, and another that it was worth between $335 and $450. The Air Force expert put the value at $200 for 12.7 acres and $195 for the balance, 134 acres. Obviously, it is impossible to expect certainty in the appraisal of such land in a community as yet not thickly settled. The decisions are full of expressions recognizing that land value almost always depends upon the hypothetical opinions of those generally familiar with transactions in the neighborhood. When there is a "market" in the sense of a large group of competing buyers or sellers the uncertainty can at times be somewhat reduced, but in such a situation as that at bar it is scarcely possible to do more than imaginatively to forecast what would be the price at which buyer and seller would agree. Granted adequate acquaintance with such actual transactions as have occurred in the past, it is impossible to do more than make an unbiased guess. Courts have repeatedly admitted as much. Thus in United States v. Miller, 317 U.S. 369, 374–375, 63 S.Ct. 276, 280, 87 L.Ed. 336, the Supreme Court said: "Where the property taken, and that in its vicinity, has not in fact been sold within recent times, or in significant amounts, the application of this concept involves, at best, a guess by informed persons." In Kimball Laundry Co. v. United States, 338 U.S. 1, 5–6, 69 S.Ct. 1434, 1438, 93 L.Ed. 1765, it said: "the value compensable under the Fifth Amendment, therefore, is only that value which is capable of transfer * * for some equivalent. Its measure is the amount of that equivalent. But since a transfer brought about by eminent domain is not a voluntary exchange, this amount can only be determined by a guess, as well informed as possible, as to what the equivalent would probably have been had a voluntary exchange taken place." See also Westchester County Park Commission v. United States, 2 Cir., 143 F.2d 688, 692. In United States v. Lambert, 2 Cir., 146 F.2d 469 (471–472) we said: "Moreover, the valuation

of real property is an issue particularly for the trial court, for, when all is said, any conclusion can never be more than speculation. Each piece of land is sui generis; there are no others like it * * * Hence we think * * * that a judge is wise, in deciding this issue, to be guided by the impression which the experts make upon him. So far as he is not, he will have to put himself in the position of an expert; and while, to some extent that is something which in the end he cannot escape, it is usually safer, so far as possible, to depend upon the apparent frankness, moderation and sagacity of the witnesses."

The appellants also argue that the declaration of "taking" did not give the Air Force any right to carry away the soil cut off from the hilltops. As a question of mere verbal interpretation it seems to us that to "remove" the soil included taking it away, but the issue is irrelevant anyway. As we have said, and as is universally accepted, the measure of the award is the damage done to the land, which in the case at bar meant the difference between its value as it stood before the "taking" and after the hilltops had been cut off. It is hardly necessary to add that the findings of the percentage of injury done to the land by the lowering of the "glide angle plane" presuppose even more impalpable considerations than those determining the entire value of the land itself.

Perhaps the judge was mistaken in believing that the value for residential purposes was greater than for any other. Although he viewed the land himself, in the end, as we have just quoted from United States v. Lambert, supra, he could do no more than decide from the appearance of the witnesses which side seemed more likely to be right, and that part of the evidence is not, and could not be, before us. The issue is one (of which there are not a few), that is not susceptible of any effective review by an appellate court—a conclusion so repellent that, no doubt litigants will continue fruitless efforts to upset it. We can only repeat the words of the Fifth Circuit in Seale v. United States, 243 F.2d 145, 146: "We fully understand and can sympathize with the disappointment of the appellants that the district judge did not accept the opinion testimony of their witnesses"; but since "we cannot, upon the evidence as a whole, determine that the finding was clearly erroneous as not within the evidence * * * we may not interfere with the finding or with the judgments based on it."

Judgment affirmed.