UNITED STATES of America, Plaintiff,

v.

CERTAIN LAND SITUATED IN THE CITY OF DETROIT, et al., Defendants.

No. 79–CV–73934–DT.

United States District Court, E.D. Michigan, Southern Division.

Feb. 20, 2002.

Ray Hamilton, Asst Us.A.—Albuquerque, NM, Matthew S. Clifford, U.S. Department of Justice, Washington, DC, for plaintiff.

Craig L. John, Willaim R. Seikaly, Bloomfield Hills, for Detroit Int'l Bridge Co.

*MEMORANDUM OPINION AND OR-
DER REGARDING PLAINTIFF'S
MOTION IN LIMINE AND DEFEN-
DANT DETROIT INTERNATION-
AL BRIDGE COMPANY'S VALUA-
TION THEORIES*

ROSEN, District Judge.

## I. INTRODUCTION

This condemnation action is presently before the Court for trial on the issue of just compensation due to Defendant Detroit International Bridge Company ("DIBCO") for two parcels of property taken by the Government in 1979 for the expansion of the U.S. Customs secondary cargo inspection facility on the American side of the Ambassador Bridge. The property taken is comprised of two parcels (A1 and A3) between 20th and 21st Streets, south of Porter Street and north of Howard Street. As of the date of taking, October 11, 1979, Parcel A1 was improved with a 43–door truck terminal. Parcel A3 was vacant land. Both parcels are in close proximity to the Ambassador Bridge. Both the Ambassador Bridge and the property taken are owned by Defendant DIBCO.

Prior to trial, the parties filed a number of *in limine* motions. The Court made its rulings on the record on February 8, 2002 on all of these motions with the exception of Plaintiff's Motion *in Limine* to Exclude the Report and Proposed Testimony of Defendant's Expert, Jonathan Vanderveen. With regard to the Vanderveen motion, the Court took the valuation issues raised therein under advisement. This engendered a series of supplemental briefs and arguments from the parties during the course of the proceedings the week of February 11, 2002. Although the Court has verbally ruled from the bench on the issues raised by the parties, it is now issuing this Memorandum Opinion and Order so that there may be a clear record of the Court's rulings as to what matters will and will not be submitted to the jury.

## II. DISCUSSION

### A. EVIDENCE OF THE BRIDGE'S LOST PROFITS/DIMINUTION IN VALUE AS EVIDENCE OF FAIR MARKET VALUE OF THE CONDEMNED PROPERTY

### 1. DIBCO MAY NOT RECOVER LOST PROFITS SUFFERED BY THE AMBASSADOR BRIDGE AS SEVERANCE DAMAGES

DIBCO seeks to offer evidence of (1) lost profits allegedly suffered by the Bridge and/or (2) the diminution in the value of its property after the taking (i.e., the difference between the before and after taking value of the Bridge and the adjacent taken property) contending that the "highest and best use" of the condemned parcel of property adjacent to the bridge is its use as part of the Ambassador Bridge. In support of its position regarding severance damages and diminution of value, DIBCO relies principally upon *United States v. 104 Acres, more or less in Keeler Township, Van Buren County,* 666 F.Supp. 1017, 1026 (W.D.Mich.1987), contending that the relevant facts of this action "are identical" to those in the *Van Buren County* case.

In *Van Buren County,* the Government took in fee a small part of one parcel of defendant's property and an easement over a substantial part of the remainder of that parcel. The property was used for farming, specifically for growing corn. The parcel had a central pivot irrigation system on it. It was undisputed that the highest and best use of the property was as a farm.

The *Van Buren* court awarded just compensation in three parts. First, it awarded the fair market value of the portion of the

parcel taken in fee based upon its highest and best use as a farm. It also awarded "partial taking" damages for the easement over the remainder of the parcel based upon the "before and after taking" value of the parcel. Third, the court found that the property owner would have also irrigated a 65–acre parcel of land he owned adjacent to the condemned property with the center pivot system that was on the principal parcel but for the Government's taking of the easement on the principal parcel which precluded such irrigation. For damage to this 65–acre adjacent parcel the Court awarded "incidental" severance damages based upon the difference in the values of irrigated and non-irrigated cornland.

It is based upon the *Van Buren* court's award of damages that DIBCO here contends that it can use its loss of revenues on the adjacent Ambassador Bridge allegedly due to the Government's taking of the adjacent property to establish the fair market value of the taken property.

As shown below, *Van Buren* is readily distinguishable from the instant case because in *Van Buren,* the adjacent property was **at the time of the taking** being put to an integrated unitary use with the condemned parcel, and as a consequence, the property owner was entitled to "severance damages" for diminution of the value of the adjacent land in addition to the fair market value of the property actually taken. Here, there is no dispute that the condemned property was *not* at the time of the taking being used as an integrated part of the Bridge.

The applicable rule of law in such cases was succinctly compiled by the court in *Baetjer v. United States,* 143 F.2d 391 (1st Cir.1944):

> The first question before us here, therefore, and the basic one in all severance damage cases, is what constitutes a "single" tract as distinguished from "separate" ones. The answer does not depend upon artificial things like boundaries between tracts as established in the owner's chain of title, nor does it depend necessarily upon whether the owner acquired his land in one transaction or even at one time. Neither does it wholly depend upon whether holdings are physically contiguous. Contiguous tracts may be "separate" ones if used separately and tracts physically separated from one another may constitute a "single" tract if put to an integrated unitary use or even if the possibility of their being so combined in use "in the reasonably near future... is reasonably sufficient to affect market value...."

> Integrated use, not physical contiguity, therefore, is the test. Physical contiguity is important, however, in that it frequently has great bearing on the question of unity of use. Tracts physically separated from one another frequently, but we cannot say always, are not and cannot be operated as a unit, and the greater the distance between them the less is the possibility of unitary operation, but separation still remains an evidentiary, not an operative fact, that is, a subsidiary fact bearing upon but not necessarily determinative of the ultimate fact upon the answer to which the question hinges.

*Id.* at 394 (citations omitted). *See also United States v. 287.89 Acres of Land in Clearfield County,* 241 F.Supp. 464 (W.D.Pa.1965) ("In determining just compensation in this case for the taking of one of three tracts of land which were in the same ownership and in fact have been used and treated as a unit, we think it is the law that they should be treated as a unit in estimating damages.").

In *International Paper Co. v. United States,* 227 F.2d 201 (5th Cir.1955), the Fifth Circuit explained the applicable principles of law as follows:

It is not denied that in rendering the "just compensation" secured by the constitution of the United States to the citizen whose property is taken for public uses it is right and proper to include the damages in the shape of deterioration in value which will result to the residue of the tract from the occupation of the part so taken. In applying this rule, however, regard is had to the integrity of the tract as a unitary holding by the owner. The holding from which a part is taken for public uses must be of such a character as that its integrity as an individual tract shall have been destroyed by the taking. Depreciation in the value of the residue of such a tract may properly be considered as allowable damages in adjusting the compensation to be given to the owner for the land taken. It is often difficult, when part of a tract is taken, to determine what is a distinct and independent tract; but the character of the holding, and the distinction between a residue of a tract whose integrity is destroyed by the taking and what are merely other parcels or holdings of the same owner, must be kept in mind in the practical application of the requirement to render just compensation from property taken for public uses. How it is applied must largely depend upon the facts of the particular case and the sound discretion of the court.

227 F.2d at 205–206 (quoting *Sharp v. United States,* 191 U.S. 341, 354, 24 S.Ct. 114, 48 L.Ed. 211 (1903).)

The weight of authority, however, is that there must be evidence that such an integrated, unitary use with an adjacent parcel of land **must have existed at the time of the taking.** *See United States v. 1,162.65 Acres of Land,* 498 F.2d 1298, 1300 (8th Cir.1974) ("[T]he applicable working rule requires that if, on the facts of a particular case, it is determined that the particular tracts condemned were at the time of tak-ing, in fact being used and devoted to a unitary use together with another tract, the tracts taken and the tracts not taken must be considered as a single unit in both the before and after valuations."); *Cole Investment Co. v. United States,* 258 F.2d 203 (9th Cir.1958); *United States v. Mattox,* 375 F.2d 461 (4th Cir.1967); *United States v. 765.55 Acres of Land,* 174 F.Supp. 1, 14 (E.D.N.Y.1959), *aff'd,* 276 F.2d 264 (2nd Cir.1960) ("[T]he concept of severance damages relates solely to the depreciation to the remainder property where a part **of a single parcel** is taken in fee."). *Accord, United States v. 104 Acres, more of less in Keeler Township, Van Buren County, supra.* It is undisputed here that at the time of the taking there was no unity of use with respect to the condemned property and DIBCO's Ambassador Bridge property.

The Court is aware that Defendant DIBCO's claim for severance damages was previously addressed by the Court's predecessor early on in the pendency of this action. *See United States v. Certain Land,* 547 F.Supp. 680 (E.D.Mich.1982). Rather than filing a motion for summary judgment on the severance damages issue, the Government had incorporated its arguments against severance damages in a motion *in limine* raising six objections to DIBCO's appraisal of the taken property. Judge Gilmore denied the Government's motion essentially finding it too early in the proceedings to enter an order *in limine* excluding broad categories of evidence. *Id.* at 681.

With respect to the severance damages aspect of the Government's March 1982 motion, Judge Gilmore stated as follows:

The government next seeks to exclude DIBC's claim for severance damages. DIBC claims severance damages for parcels which it owns, but which have not been condemned, arguing that these

parcels have lost value because of the compensation, and that it should be compensated for this loss of value. The parcels involved are parcels B1, B2, and B3 . . . . Parcels B1 and B2 are presently owned in fee simple by DIBC, and parcel B3 represents a reversionary interest in 21st Street, presently owned by the City of Detroit. The appraisal seems to give special value to this reversionary interest because DIBC has an interest in both sides of 21st Street and claims it could have convinced the City of Detroit to close the street, thus completely integrating parcel A1 with the current bridge plaza, and presumably making the land even more valuable.

The government contends that severance damages cannot be granted unless the severed property was in actual unitary use with the condemned property at the time of the taking, citing *Cole Investment Co. v. United States,* 258 F.2d 203 (9th Cir.1958). It claims that the parcels in question here were not in such unitary use and, therefore, severance damages cannot be granted. On the other hand, DIBC argues that the unitary concept has not been universally accepted, citing *Baetjer v. United States,* 143 F.2d 391 (1st Cir.1944). The test the Court will adopt here is that of *United States v. 105.40 Acres of Land, More or Less, in Porter County, State of Indiana,* 471 F.2d 207 (7th Cir.1972) which applied a "reasonableness" test. The Court there said the proper question to be asked was whether in the reasonably near future there was a reasonable probability that the lands in question would be put to their highest and best use in combination with the main tract so as to affect their market value. *Id.* at 211.

This matter, again, must be resolved in trial. The Court will allow evidence of severance damages subject to a preliminary factual determination that DIBC has introduced evidence sufficient to support a finding under Federal Rules of Evidence 104(b) that there was a reasonable probability that the severed parcels would be put to a unitary use with parcel A1 in the near future. If the preliminary factual determination finds a sufficient basis, then evidence of severance damages will go in. If the preliminary factual predicate is not laid, then they will be excluded. This can only be decided at trial, and this portion of the motion in limine must be denied.

547 F.Supp. at 685–86.

The problem with Judge Gilmore's analysis is that it conflates the notion of severance damages with the notion of "highest and best use." As indicated in his Opinion, Judge Gilmore relied upon the *Porter County, Indiana* case. *Porter County,* however, did not involve a claim for severance damages. In fact, Bethlehem Steel Company, the defendant-property owner in the *Porter County* case, had specifically disclaimed severance damages. 471 F.2d at 209.

The issue presented in *Porter County* was simply one of "highest and best use" and whether the defendant could present evidence that the highest and best use of two condemned parcels of undeveloped Lake Michigan shoreline property was their use as accessory areas (for parking, storage, maintenance, office buildings, medical facilities, and/or police and fire stations) necessary to Bethlehem Steel's new steel mill development which was already under construction on the company's property on the other side of the state highway. The issue was not whether the steel company could recover damages to its steel production business because of the Government's taking of the two shoreline parcels of land. It was in holding that Bethlehem was entitled to show that the highest and best use of the two parcels of

property was as accessory areas to a fully developed and integrated steel plant that the *Porter County* court stated that the then current non-unitary use of the two tracts by itself was not fatal to Bethlehem's unitary theory: "The relevant question was not the uses to which Bethlehem had devoted its land... but whether in the 'reasonably near future' there was a 'reasonable probability' of the lands in question being put to their 'highest and best use' in combination with the main tract so as to affect their market value." 471 F.2d at 211. It is this "reasonableness" test of "highest and best use" in combination with other property owned by the defendant that Judge Gilmore quoted and relied upon in his 1982 Opinion in the instant action.

█ While DIBCO may argue that Judge Gilmore's ruling is the "law of the case" on the availability of severance damages, it is well-settled that under the law of the case doctrine, it is not improper for a court to depart from a prior holding if it is convinced that it is clearly erroneous and would work a manifest injustice. *Arizona v. California,* 460 U.S. 605, 619, 103 S.Ct. 1382, 75 L.Ed.2d 318 n. 8, 460 U.S. 605, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983); *E.E.O.C. v. United Ass'n of Journeymen and Apprentices of the Plumbing and Pipefitters Industry of the U.S.,* 235 F.3d 244, 249 (6th Cir.2000); *Free v. Abbott Laboratories, Inc.,* 164 F.3d 270, 272 (5th Cir.1999); *Wheeler v. City of Pleasant Grove* 746 F.2d 1437 (11th Cir.1984). In *Hanover Ins. Co. v. American Eng'g Co.,* 105 F.3d 306 (6th Cir.1997), the Sixth Circuit emphasized, "[T]his 'law of the case' doctrine is 'directed to a court's common sense' and is not an 'inexorable command.'.... It is within the sole discretion of a court to determine if a prior ruling should be reconsidered. Thus, we decline to impose any conditions or limitations upon a court's power to review a prior ruling of [its own or of] another court." *Id.* at 312 (citations omitted).

As this Court observed on the record on February 11, 2002, this Court's obligation is to have this case go to the jury on the proper law. To the extent that Judge Gilmore's 1982 decision may be read as a statement of law that severance damages may be available if DIBCO could show that it would be reasonably probable that in the reasonably near future DIBCO would have put the taken property and its Ambassador Bridge property to a unitary use, this Court finds such a statement of law to be clearly erroneous. As indicated above, the great weight of authority is that in order to recover severance damages such a unitary use with an adjacent parcel of land **must have existed at the time of the taking.** *See United States v. 1, 162.65 Acres of Land,* 498 F.2d 1298, 1300 (8th Cir.1974); *Cole Investment Co. v. United States,* 258 F.2d 203 (9th Cir.1958); *United States v. Mattox,* 375 F.2d 461 (4th Cir. 1967); *United States v. 765.55 Acres of Land,* 174 F.Supp. 1, 14 (E.D.N.Y.1959), *aff'd,* 276 F.2d 264 (2nd Cir.1960). *Accord, United States v. 104 Acres of Land Situated in Van Buren County, supra. Cf. United States v. Wateree Power Co.,* 220 F.2d 226 (4th Cir.1955) (where evidence established the taking of 1,530–acre tract of land destroyed access to river of 2,770–acre adjacent tract which commissioners found was capable for use as site for heavy-water-using industries, defendant was entitled to severance damages based on the difference in the value of 2,770–acre tract as a water-using industry site and its value for farm and timber purposes despite the fact that there was no current water-using industry on defendant's property; damages, however, were not permitted based upon the depreciation of defendant's entire 13,582–acre tract as a whole.)

No unitary use having existed at the time of the taking the Court finds that DIBCO is not entitled to severance dam-

ages based upon damages (i.e., lost profits) incurred by the Ambassador Bridge.[1]

## 2. THIS IS NOT A "PARTIAL TAKING" CASE

■ DIBCO also contends that it is entitled to damages based upon the diminution in value of all of its property (i.e., the difference in cumulative value of all of its property—parcels A1, A3 and the Ambassador Bridge property—before and after the taking of parcels A1 and A3) arguing that this is a partial taking of the Ambassador Bridge, not a complete taking of separate parcels which just happen to be adjacent to or in physical proximity to the Bridge.

As a general proposition, the "test" for determining whether a partial taking has occurred is substantially the same as the test discussed above with respect to severance damages. Indeed, *Nichols on Eminent Domain* addresses severance damages compensation (i.e., the value of the property actually taken, plus severance damages to the remainder) as being one of the two alternative theories of compensation for partial takings. *See* 4A *Nichols on Eminent Domain* § 14.02[1][a], p. 14–30 (3d ed.). The other theory of partial taking damages is the "before and after rule." *Id.* §§ 14.02[1][a],[b], pp. 14–30 to 14–31. *See also United States v. Banisadr Building Joint Venture,* 65 F.3d 374, 378 (4th Cir.1995) ("[I]t is well settled that in the event of a 'partial taking'—i.e., a case in which the Government has taken one part of a larger tract, leaving the remainder to the landowner—the measure of just compensation is the difference between the fair and reasonable market value of the land immediately before the taking and the fair and reasonable market value of the portion that remains after the taking"); *United States v. 9.20 Acres of Land,* 638 F.2d 1123, 1126–27 (8th Cir.1981) This is the theory of damages that Defendant DIBCO seeks to apply here.[2]

■ As with determining whether severance damages are recoverable, in determining whether Defendant is entitled to recover damages based upon the differ-

1. As the Court indicated on the record on February 11, 2002, it is clear that there has been some prejudice to DIBCO and the Government by the incorrect statement of law in Judge Gilmore's opinion in that they may have prepared their experts based on an incorrect reading of *Porter County* and their reports may reflect this. In order to mitigate the prejudice, the Court will permit the parties to proceed with their proofs on highest and best use under *Porter County*.

2. DIBCO contends that the Government should be estopped from disputing that this is a partial taking. In support of this contention, DIBCO points to the report of the Government's appraiser, Donald Treadwell, in which Mr. Treadwell "assumed," for purposes of his 1985 appraisal that the terminal property was part of the entire Bridge Company property and stated that "[t]he purpose of the appraisal is to estimate the damages due to the taking of the 'terminal property' from the entire property owned by the Detroit International Bridge Company." [*See* DIBCO's "Supplemental Brief Regarding Unity of Use"] DIBCO also points to excerpts from the Government's Trial Brief in which the Government set out the law regarding partial takings and partial taking damages. *Id.* Neither Mr. Treadwell's opinion statements nor the statements of law in the Government's Trial Brief are factual assertions and the fact that Mr. Treadwell assumed for purposes of his second appraisal that there was a partial taking is irrelevant; Treadwell's first appraisal was based upon a complete taking theory. It is not uncommon for parties in eminent domain actions to proceed under alternate theories of market value. *See, e.g., United States v. 10.0 Acres of Land,* 533 F.2d 1092 (9th Cir.1976), in which the parties were permitted to offer four different theories of market value, including by opinion evidence of the market value of the property taken based upon a complete taking theory and based upon a "before and after" valuation for a partial taking.

ence between the value of its property before and after the taking, the first inquiry that must be made is to determine whether the property taken consists of one entire cohesive whole or of several independent parcels. Traditionally, there are three elements to establishing a unity between separate parcels: (1) unity of ownership; (2) contiguity; and (3) unity of use. *Nichols, supra,* § 14B.03[1]. Unity of use is the most important element. *Id.,* p. 14B–14.

■ The owner's actual use of his property in terms of physical and legal use at the time of taking creates a presumption as to the existence or absence of a unity of multiple parcels. *Id.,* § 14B.03[6]. This presumption, however, is rebuttable. *Id.* Facts which have supported unity include such things as fencing the entire property, or accounting for all of the operations under a single set of books. *Id.,* § 14B.03[4][a], and cases cited therein.

As discussed in the *Porter County* case, the question to be asked is whether in the reasonably near future there was a reasonable probability that the lands in question would be dedicated to their highest and best use in combination with the main tract so as to affect their market value. *United States v. 105.40 Acres of Land in Porter County, Indiana, supra,* 471 F.2d at 211.

■ Whether there is such a unity of use is a question for the Court to decide. Fed. R. Civ. Pro. 71A(b) provides that, except for the single issue of just compensation, the trial judge is to decide all issues, legal and factual that may be presented. *See also, United States v. Reynolds,* 397 U.S. 14, 90 S.Ct. 803, 25 L.Ed.2d 12 (1970). With respect to the unity issue, in *Porter County,* the Seventh Circuit specifically held that this issue was for the court to decide:

We hold that under *Reynolds, supra,* the district judge should—upon proper consideration of evidence—decide the factual question whether the condemned parcels here were an integral part of the 1939 acres, or were functionally separate parcels. The judge should then instruct the jury on the issue of just compensation, consistent with his preliminary factual determination.

471 F.2d at 212. *See also, United States v. 158.24 Acres of Land in Bee County, Texas,* 373 F.Supp. 659, 660 (S.D.Tex.1974) (court to decide factual dispute as to whether the fee taking of 26.556 acres is actually a partial taking of a larger 3,500–acre tract or a complete taking of a separate 26.556–acre tract which is adjacent to said larger tract). *Cf., United States v. 8.41 Acres of Land Situated in Orange County, Texas,* 680 F.2d 388, 393 (5th Cir. 1982) ("When applicable, the issue of unity or separateness of tracts is a question of fact to be presented to the trier of fact"); *West Virginia Pulp & Paper Co. v. United States,* 200 F.2d 100 (4th Cir.1952) (relied upon by DIBCO in its "Supplemental Authority on the Question of Partial Taking and the Damages Award able") ("*If evidence were such as to leave it a matter of some doubt* whether the land owned by the plaintiff in error were one tract or separated into three separate and distinct tracts, it would be proper to leave the question to the jury . . . ." (emphasis added)).

However, as indicated in the *Orange County* and *West Virginia Pulp & Paper* cases, and as explained by *Nichols,* the presence or absence of unity of use becomes a question of law for court to decide where reasonable minds cannot differ. *Nichols on Eminent Domain, supra,* § 14B.04[1]. This is in accord with the inherent power of the court, as a matter of law, to determine what particular evidence is so remote or speculative as to be lacking in probative value and to be excluded from consideration by the trier of fact. *Id.*

Thus, in *International Paper Co. v. United States*, 227 F.2d 201, 205–206 (5th Cir.1955), the appellate court found no error on the part of the district court in refusing to submit to the jury the question of whether woodland property taken by the government and a paper mill and other parcels of land owned by International Paper constituted a "unitary tract" such that it might be entitled to compensation in the form of depreciation of market value of the entire unit where the evidence presented showed that 85% to 90% of the wood used in the processing of paper was acquired from individual owners of other timber tracts and only 10% to 15% came from International Paper's own acreage. "[T]he facts as to the indiscriminate use by the paper mill of its own and other's wood products indicates that a finding of unitary use could not be properly based upon either the current operation or any reasonable expectation in the foreseeable future that appellant would consider its own small tracts in any different light than the tracts of small owners whose products would be available on a competitive basis." *Id.* at 206.

A landowner's proposed unitary use has further been held unreasonable and the question of unity of use properly withheld from the jury where the landowner purchases the property in question with knowledge of the Government's intended taking. *See United States v. Mattox*, 375 F.2d 461, 463–64 (4th Cir.1967). In *Mattox*, the Fourth Circuit found the landowner's proposed use of the condemned property as a lumber mill site "improbable" because he purchased the property with knowledge of the Government's Sutton Dam and Reservoir project. In addressing the unity of use question for purposes of severance damages, the *Mattox* court stated:

We can agree that the physical proximity and the possibility of an integrated use of two separate tracts would give rise to an additional economic value to each, but it does not follow that the mere proximity or possibility of the integrated use will confer upon the owner a right to severance damages. In addition to these factors, *there must exist a reasonable probability that the separate tracts would have been combined for such integrated use.* The error in the defendant's argument is that it does not reflect the realities of the situation. It fails to take into consideration the fact that when the defendant purchased the three tracts, the Government project was already well under way. Thus, the integrated use of the fee tract and mill site was if not actually impossible at least highly improbable. It offends our sense of justice that the Government should be required to pay the defendant an alleged damage to his fee tract which, if it occurred at all, occurred before he purchased.

·*The plan which constituted the basis for defendant's evaluation of his fee tract was doomed* **when the flood control project was initiated.** This fact became more obvious as each step in the progress of the project took place. In 1949 the land for the dam site was acquired, and in 1950 the acquisition of land for the reservoir started. In that year too, the relocation was begun of the long neglected and dilapidated railway track which had served the mill site some 40 years previously. In 1956 the construction of the dam began, and it was a year in progress when defendant purchased his property. Projects of such importance do not take place in the wilds of the West Virginia mountains without widespread knowledge thereof throughout the community. The defendant's proffer of evidence and concessions of counsel in our court do not deny that he had knowledge of these background facts, *though he does apparently*

contend that he had **no personal knowledge** *that this particular 28.91–acre tract would be taken. We think the trial court's conclusion that the possibility that land lying on the banks of the Elk River, which was already being dammed, would be condemned was sufficient to make the defendant's joint use of that property too improbable to justify such use as a measure of damages in this case.* **Whether the defendant blindly or deliberately bought into the situation does not affect the improbability of his plan.** In *United States ex rel. TVA v. Powelson,* 319 U.S. 266, 275, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943), in discussing this issue the Court said:

> "An owner of lands sought to be condemned is entitled to their 'market value fairly determined.' That value may reflect not only the use to which the property is presently devoted but also that use to which it may be readily converted (citing cases). In that connection the value may be determined in light of the special or higher use of the land when combined with other parcels; it need not be measured merely by the use to which the land is or can be put as a separated tract. *But in order for that special adaptability to be considered, there must be a reasonable probability of the lands in question being combined with other tracts for that purpose in the reasonably near future. In absence of such a showing, the chance of their being united for that special use is regarded 'as too remote and speculative to have any legitimate effect upon the valuation.' "*

375 F.2d at 463–464 (citations omitted and emphasis added.) *See also, United States v. 99.66 Acres of Land,* 970 F.2d 651, 657 (9th Cir.1992); *United States v. 1735 N. Lynn St.,* 676 F.Supp. 693, 700 (E.D.Va. 1987).

### 3. HIGHEST AND BEST USE

■ The Supreme Court's *Powelson* decision (quoted in *Mattox, supra* ) demonstrates that the reasonable probability of condemned property being combined with other tracts in the reasonably near future for some unitary use is also the standard applicable for determining whether such a unitary use may be considered the "highest and best use" of the condemned property.

As Judge Gilmore observed in his 1982 opinion in this case, "[O]ne of the basic principles of eminent domain law is that the condemnee is entitled to not just the value of his property as used at the time of the taking, but rather the value his property would command on the open market in light of the highest and most profitable use to which it might reasonably be devoted in the near future." *United States v. Certain Land,* 547 F.Supp. 680, 686–87 (E.D.Mich. 1982).

The "highest and best use" doctrine was explained by the Supreme Court in *Olson v. United States,* 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236 (1934):

> The sum required to be paid the owner does not depend upon the uses to which he has devoted his land but is to be arrived at upon just consideration of all the uses for which it is suitable. The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held. **The fact that the most profitable use of the parcel can be made only in combination with other lands does not necessarily exclude that use from consideration if the possibility of combination is reasonably**

sufficient to affect market value.... But the value to be ascertained does not include, and the owner is not entitled to compensation for, any element resulting subsequently to or because of the taking. Considerations that may not reasonably be held to affect market value are excluded. Value to the taker of a piece of land combined with other parcels for public use is not a measure of or a guide to the compensation to which the owner is entitled. The use of shorelands for reservoir purposes prior to the taking shows merely the physical possibility of so controlling the level of the lake. But physical adaptability alone cannot be deemed to affect market value. There must be a reasonable possibility that the owner could use his tract together with other shorelands for reservoir purposes or that another could acquire all lands and easements necessary for that use....

... In respect of each item of property, that value may be deemed to be the sum which, considering all the circumstances, could have been obtained for it; that is the amount that in all probability would have been arrived at by fair negotiations between an owner willing to sell and a purchaser desiring to buy. **In making that estimate there should be taken into account all considerations that fairly might be brought forward and reasonably be given substantial weight in such bargaining. The determination is to be made in the light of all facts affecting the market value that are shown by the evidence taken in connection with those of such general notoriety as not to require proof. Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable should be excluded from consideration for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned in business transactions as well as in judicial ascertainment of truth.**

292 U.S. at 257, 54 S.Ct. at 710 (citations omitted).

Whether a landowner's proposed use is reasonable is a matter for the Court to decide. As Judge Gilmore correctly observed in 1982,

It will be the responsibility of the Court at trial to screen the potential uses and exclude from jury consideration those uses which have not been demonstrated to be practicable and reasonable under the *Olson* test. *Olson* holds that in examining a proposed use a two-part test is applied: 1) a showing of reasonable probability that the land is both physically adaptable for such use, and 2) evidence that there is a need or demand for such use in the reasonably near future. *At trial, the Court will determine whether the land owner has produced credible evidence that a potential use is reasonable practicable and reasonably probable in the near future. If such credible evidence is produced, the jury will then decide whether the property's suitability for this use enhances its market value, and if so, by how much.*

547 F.Supp. at 687 (emphasis added). *See also, United States v. 320.0 Acres, County of Monroe, Fla.,* 605 F.2d 762 (5th Cir. 1979) (the *"Everglades"* case) ("[I]t is the trial court's responsibility under Rule 71A(h) to screen all proffered potential use evidence and exclude from consideration by the trier of fact... alleged potential uses which have not been demonstrated to be practicable and reasonably probable...."); *United States v. 341.45 Acres of Land Located in County of St. Louis, Minnesota,* 633 F.2d 108, 111 (8th Cir.

1980); *United States v. 77,819.10 Acres of Land,* 647 F.2d 104, 110 (10th Cir.1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 441.

■ Applying the foregoing to the facts of this case, the evidence presented in this case shows that the Government's intention to take the property was made public prior to the time that DIBCO purchased the parcels of property at issue. DIBCO had specific knowledge of the intended taking at least as of December 1976. [*See* Plaintiff's Ex. 27, letter from DIBCO president Roy Lancaster to Dennis Keilman, Director of the GSA Space Management Division, acknowledging DIBCO's awareness of the prospectus for the taking submitted by GSA to Congress.] Moreover, any integrated use of the condemned property with the Bridge was dependent upon the City of Detroit's vacating of 21st Street and Nash Sogoian's sale of his parcel of land to DIBCO. As of the date of taking, no steps were taken by DIBCO to effectuate the vacation of 21st Street and Defendant's own witnesses testified that Sogoian flatly refused to sell his property to DIBCO. Furthermore, even DIBCO president, Roy Lancaster, admitted in his deposition that any integrated use of the property with the Bridge property was merely a "possibility." [*See* Lancaster 7/16/84 Deposition, p. 56.]

For these reasons, the Court finds that there was no reasonable probability of the property in question being combined and used in conjunction with Defendant's Ambassador Bridge property in the reasonably near future.

Furthermore, the evidence was overwhelming that DIBCO's intended integrated use of the property was for U.S. Customs to use it for truck inspection. *See* Plaintiff's Exhibits 23–30 and in particular Plaintiff's Ex. 26, Letter from Roy G. Lancaster, President of DIBCO to DIBCO's Carrier Customers ("Our land and ware-house facility located immediately adjacent to the east side of the Detroit plaza (formerly the Overland Western terminal)... was originally purchased by our Company in order to provide an expanded and efficient secondary truck inspection facility for U.S. Customs ....") and Plaintiff's Ex. 23, Lancaster November 10, 1977 Letter at Plaintiff's Ex. 23 ("The property has been vacant and available to U.S. Customs since July 11, 1977."). *See also,* Lancaster 7/16/84 Deposition, p. 56 ("We were primarily concerned with acquiring the [Overland] property for one basic purpose. To get started and to have Customs utilize it, the property for customs inspection.") In fact, all of DIBCO's witnesses testified that the property's intended use was for a Customs inspection facility. Indeed, this is what DIBCO told its shareholders was the reason for its purchase of the property.

In its 1977 Annual Report, DIBCO informed its shareholders that "the 3½ acre trucking terminal property adjacent to the Detroit plaza of the Ambassador Bridge was purchased by the Company in June, 1977 so that it could be leased or resold for use by United States Customs as an examining warehouse for commercial vehicles entering the United States from Canada." [*See* Plaintiff's Ex. 30.] DIBCO even had prominent Detroit architects, Smith, Hinchman & Grylls, draw up site plans for use of the property as a Customs secondary truck inspection facility. [*See* Plaintiff's Ex. 29. *See also,* Lancaster Dep. pp. 70, 72.]

■ This use of the subject property to alleviate traffic congestion on the Bridge by providing Customs with a truck inspection facility off of the Bridge plaza, however, does not avail DIBCO. It is clear that this intended use of the as a Customs inspection facility obtains its value from the Government. As the Supreme Court made clear in *United States v. Full-*

*er,* 409 U.S. 488, 492, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973), "the Government as condemnor may not be required to compensate a condemnee for elements of value that the Government has created." Moreover, it is well-settled that a highest and best use cannot be the use for which the Government is acquiring the property, unless there is a prospect and competitive demand for that use by entities other than the Government. *United States v. Chandler–Dunbar Water Power Co.,* 229 U.S. 53, 80–81, 33 S.Ct. 667, 57 L.Ed. 1063 (1913); *United States v. 320.0 Acres of Land,* 605 F.2d 762, 781 (5th Cir.1979); *United States v. 46,672.96 Acres of Land,* 521 F.2d 13, 15–16 (10th Cir.1975); *United States v. Weyerhaeuser Co.,* 538 F.2d 1363, 1366, 1367 (9th Cir.1976), *cert. denied,* 429 U.S. 929, 97 S.Ct. 336, 50 L.Ed.2d 300 (1976). DIBCO has not demonstrated that, other than for use by the Government, a cognizable market exists for Customs inspection facilities.

The foregoing authorities make clear that any value of the condemned property as a Customs inspection facility is non-compensable.

**B.** ***DIBCO IS NOT ENTITLED TO COMPENSATION BASED ON ANY SPECIAL VALUE OF THE PROPERTY TO DIBCO***

■ Even if the Court were to find that DIBCO's intended integrated use of the taken property with the Bridge property was reasonably probable, it is well-settled that the fair market value for which an owner must be compensated is an objectively transferable market value. *See Kimball Laundry Co. v. United States,* 338 U.S. 1, 5, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949). Thus, fair market value does not include the special value of property to the owner arising from its unique adaptability to his particular use. *United States v. 564.54 Acres of Land,* 441 U.S. 506, 511–12, 99 S.Ct. 1854, 60 L.Ed.2d 435 (1979);

*United States v. Cors,* 337 U.S. 325, 332, 69 S.Ct. 1086, 93 L.Ed. 1392 (1949); *United States v. Petty Motor Co.,* 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729 (1946). As the Sixth Circuit explained in *United States for the use of the Tennessee Valley Authority v. Easement and Right of Way 100 Feet Wide,* 447 F.2d 1317 (6th Cir.1971) (the *"Hadley"* case),

It is also well accepted that the fair market value for the highest and best use of the property is the generally accepted standard for demonstrating "just compensation" when property is taken by condemnation.

Just compensation includes all elements of value that inhere in the property, but it does not exceed market value fairly determined. The sum required to be paid the owner does not depend upon the uses to which he has devoted his land but is to be arrived at upon just consideration of all the uses for which it is suitable. The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held.

Thus, the law recognizes that while consideration must be given to the adaptability of the property in the future **just compensation is not the value to the owner for his peculiar purpose;** and it is generally accepted that there must be demonstrated an actual profitable use or a market demand for the prospective use.

447 F.2d at 1319 (citations omitted).

The *Hadley* case involved the taking of an easement over the defendant's farm

property for a high tension transmission line. The owner of the farm was also the president and majority stockholder of a construction company which owned an airplane used for the purpose of transporting personnel to various construction projects. The plane was routinely hangered and serviced at an airport located approximately 25 miles away. Without any knowledge of the proposed TVA transmission line, Hadley conceived the plan of locating a private airfield on his farm which he would then lease to the company of which he was president. He contended that the farm property over which the TVA took an easement had a substantial additional value because of the plans for construction of the airfield.

The court found that the airfield would have been built if the condemnation had not occurred. But the court also found that the highest and best use for the land involved was for agricultural purposes and held that the owner of the farm was not entitled to recover for the personal and peculiar value to him of the use of a portion of the property taken for an airfield. 447 F.2d at 1319. The court also found that the landowner was not entitled to recover for frustration of his plans to construct the airstrip. *Id. See also, United States ex. rel TVA v. T. Indus. Inc.*, 489 F.2d 921, 925 (6th Cir.1974) ("frustration of future business plans is not compensable" even if there is concrete evidence of such plans); *United States v. 1735 North Lynn Street, supra,* 673 F.Supp. 693, 701 (E.D.Va.1987) (consequential damages for the frustration of renovation and rental plans are impermissible in federal condemnation proceedings). As succinctly stated by the Supreme Court in *United States ex rel. TVA v. Powelson,* 319 U.S. 266, 281–82, 63 S.Ct. 1047, 1056, 87 L.Ed. 1390 (1943), "[T]he sovereign must pay only for what it takes not for the opportunities which the owner may lose."

In this case, Defendant's expert, William Walsh, testified, in part, that the highest and best use of parcels A1 and A3 was their use as an integrated part of the Ambassador Bridge to expand the Bridge Plaza and improve traffic flow off the Bridge, such that Bridge revenues would be increased. The value he attributed to this use was $50.00 per square foot. He then opined that the Government's taking destroyed DIBCO's capacity to create an expanded plaza, i.e., that DIBCO's desired use of the property was frustrated by the taking.

Mr. Walsh's proffered highest and best use of the taken property is clearly a special use to DIBCO, as it obviously rests on its integrated use with the Bridge. Mr. Walsh, in fact, admitted this. There is no independent value in the market place for this use. Therefore, the jury will not be permitted to base its determination of just compensation due to DIBCO based upon this special use or frustration of its plans. *See United States v. An Easement and Right of Way 100 Feet Wide, supra; United States ex rel. T.V.A. v. T. Indus., Inc., supra.* Accordingly, the jury will be instructed to disregard Mr. Walsh's testimony regarding this use.[3]

Although DIBCO is not entitled to compensation based upon the integrated use of the subject property with the Bridge, there is no rule of law that precludes

---

**3.** Based upon the Court's ruling on this issue, Defendant's "Motion for a Judgment as a Matter of Law" in which DIBCO asks that the Court rule as a matter of law that the highest and best use of parcel three is to relieve traffic from the Ambassador Bridge is DENIED.

DIBCO from taking advantage of the property's location proximate to the Bridge in its valuation of the property. In addition to his testimony regarding the integrated use of the property with the Bridge property, Mr. Walsh testified that the taken property could also be used for other purposes, such as a bonded warehouse, or for the relocation of one or more of the ancillary enterprises presently located on the Bridge plaza, and that used in such a capacity, the property would have an enhanced value by virtue of its proximity to the Ambassador Bridge. The jury may consider such other uses and the enhanced value of the property created by its proximity to the Bridge.

## CONCLUSION

For all of the foregoing reasons, the jury will be asked to determine only (1) whether the highest and best use of the taken property is the Government's proffered highest and best use of the property as a truck terminal or DIBCO's proffered highest and best use of the property as a bonded warehouse or some other such facility having an enhanced market value due to the property's proximity to the Ambassador Bridge; and (2) the amount of just compensation to be paid to DIBCO based upon this determination of the highest and best use of the property.